OPINION
{¶ 1} Defendant-appellant Freddie Lewis appeals after being convicted of aggravated murder and aggravated robbery in the Mahoning County Common Pleas Court. He raises issues concerning suppression of a statement to police, prosecutorial misconduct in closing arguments, excuse of a juror for cause, sufficiency and weight of the evidence, the effectiveness of counsel, and cumulative error involving six other allegations. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE {¶ 2} On February 21, 2002, twenty-one year old college student, Justin Treasic, was found dying on the side of the road in Youngstown with a gunshot wound to the head and his pockets turned inside out. Appellant was identified as a suspect. He subsequently gave statements to police establishing he was present while his cousin, William Vaughn, shot the victim. We save the more detailed facts for appellant's arguments on sufficiency and weight of the evidence presented in assignment of error number four.
 {¶ 3} Appellant and Vaughn were indicted for aggravated murder and aggravated robbery with firearm specifications. Appellant filed a motion to suppress his statement on the grounds that he requested a lawyer prior to making the statement and that his statement was coerced and not voluntary. Detective Kelty and appellant testified at the suppression hearing. On January 21, 2003, the trial court denied appellant's suppression motion. The next day, the court expanded its entry to add findings of fact and conclusions of law.
 {¶ 4} The case proceeded to trial, and on January 29, 2003, the jury found appellant guilty of complicity to aggravated robbery and complicity to aggravated murder with firearm specifications. On February 27, 2003, the court sentenced appellant on the aggravated murder conviction to life with possibility of parole after twenty years to run consecutive to ten years for aggravated robbery plus three years of actual incarceration for the merged firearm specifications. The within timely notice of appeal followed. Briefing was not completed until December 2004.
 ASSIGNMENT OF ERROR NUMBER ONE {¶ 5} Appellant sets forth six assignments of error, the first of which provides:
 {¶ 6} "The trial court erred to the prejudice of the appellant by overruling his motion to suppress made in violation of his miranda rights, which decision was contrary to the protections of the fifth andfourteenth amendments of the united states constitution and contrary to the case law of the state of Ohio."
 {¶ 7} Appellant argues that he asked for a lawyer (or his mother) prior to questioning but was informed that he could not use the telephone and that he had questions to answer. (Supp. Tr. 46-47). Appellant notes that upon a defendant's request for counsel, interrogation must stop until counsel is present. See Arizona v. Roberson (1988), 486 U.S. 675,677; Edwards v. Arizona (1981), 451 U.S. 477, 484-485. In order to invoke this request and cease the questioning, the defendant must articulate his desire in a sufficiently unambiguous and clear manner so that a reasonable police officer would understand the statement to be a request for counsel. Davis v. United States (1994), 512 U.S. 452, 459.
 {¶ 8} Here, Detective Kelty testified that he and Detective Kelly interrogated appellant. Detective Kelty testified that appellant was not Mirandized or questioned until the video camera began recording. The videotaped statement was played at the suppression hearing. Appellant did not mention his desire for his mother or a lawyer while the videotape was running. Detective Kelty testified that appellant did not ask for counsel or his mother before the videotaped interrogation began. (Supp. Tr. 10, 21).
 {¶ 9} On the other hand, appellant testified that he asked Detective Kelly if he could call his mother or have a lawyer present but was informed that he was not allowed to use the phone and that he should sit there and answer questions. (Supp. Tr. 46-47).
 {¶ 10} At a suppression hearing, weighing of the evidence and judging the witnesses' credibility are issues for the trial court. State v.Mills (1992), 62 Ohio St.3d 357, 366. Because the trial court can find a police officer's testimony to be more credible than the defendant's, the reviewing courts defer to the trial court's decisions on weight and credibility. State v. Brown, 100 Ohio St.3d 51, 2003-Ohio-5059, ¶ 15.
 {¶ 11} Here, the trial court specifically found appellant's testimony lacked credibility. We shall defer to the trial court's decision on this matter. See Id. at ¶ 19 (where the Supreme Court deferred to the trial court's acceptance of the detective's testimony that he had no recollection of the defendant asking for a lawyer).
 {¶ 12} Under this assignment of error, appellant also contends that his statement was not knowing, intelligent, or voluntary. He notes that he was nineteen years old, never finished high school, and has a hard time understanding what he reads. Appellant complains that the detective admitted that he asked leading questions, misstated the facts to appellant, and pounded on the table.
 {¶ 13} Initially we note that appellant did not contend that his waiver of his Miranda rights was not knowing or intelligent in any of his three suppression memoranda presented to the trial court. Rather, he argued only that his waiver was not voluntary. Thus, the voluntariness argument is preserved for appeal purposes, but the knowing and intelligent arguments are not. Regardless, his waiver appears to be not only voluntary but also knowing and intelligent.
 {¶ 14} An involuntary statement is one where the defendant's will has been overborne and his capacity for self-determination has been critically impaired due to coercive police conduct. State v. Nields
(2001), 93 Ohio St.3d 6, 14. In order to determine voluntariness, one views the totality of the circumstances, including: age; mentality; prior experience with the criminal justice system; length, intensity, and frequency of interrogation; physical deprivation of food, water, medicine, or sleep; mistreatment; and threats or inducements. State v.Brooks (1996), 75 Ohio St.3d 148, 154, citing State v. Edwards (1976),49 Ohio St.2d 31, 40-41.
 {¶ 15} Contrary to appellant's suggestion, a statement is not coerced merely due to an officer's statement that the defendant should tell the truth. Edwards, 49 Ohio St.2d at 41 (also noting it is not coercive to advise the defendant to avoid getting caught "holding the bag or to advise that the court will be more lenient if the defendant tells the truth). The detective's act of pounding the table with his hand one time as he asked appellant to get on with the statement is not coercive.
 {¶ 16} Moreover, the use of leading questions does not coerce an individual to submit to those questions. Appellant's story changed during the videotaped questioning, and, the trial court could view appellant's decision-making process as he made his statement. The features of the interrogation did not suggest coercion. In fact, the interrogation lasted only thirty minutes and took place near noon. Finally, there were no allegations of physical deprivations or other mistreatment, and there were no threats or inducements. In fact, appellant did not outline feelings of coercion in his testimony at the suppression hearing. The trial court was in the best position to determine the weight to give appellant's claims.
 {¶ 17} Appellant also focuses on the officer's misstatement during the interview. The officer stated that two witnesses could testify that Vaughn reentered appellant's car after the shooting. Actually, two witnesses could testify that the victim was seen joining two black males in a car fitting the description of appellant's car, but only one witness could testify that a car fitting the description of appellant's was seen leaving the area just after the shooting. (Supp. Tr. 29-20). Such misstatement does not make appellant's statement involuntary. See Brown,100 Ohio St.3d 51, at ¶ 17 The Supreme Court has upheld a more extreme misstatement, where the police misled the defendant into thinking thathis crime had been entirely caught on videotape. Id.
 {¶ 18} Appellant was advised of his rights and the effect of the waiver. Appellant was nineteen years old. Appellant stated that he did not graduate from high school; he also claimed that he could read but could not understand what he read. One of his suppression motions alleged that his IQ was 71; however, no testimony at the suppression hearing confirmed this as fact.
 {¶ 19} Appellant appeared to read the forms presented for his signature. Moreover, Detective Kelty read the forms to him. Further, appellant asked intelligent questions of the police concerning the rights waiver and his concerns seemed to be sufficiently clarified. See Statev. Santini (2001), 144 Ohio App.3d 396, 407 (7th Dist.). The circumstances surrounding the interrogation can reveal the defendant's level of comprehension. Id. Even a mentally retarded and illiterate individual can waive his rights. See Id.
 {¶ 20} Under the totality of the circumstances, the trial court could reasonably find that appellant's statement was voluntary, knowing, and intelligent. As such, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER TWO {¶ 21} Appellant's second assignment of error provides:
 {¶ 22} "The appellant was unduly prejudiced when the state committed prosecutorial misconduct in closing argument by making accusations that appellant `was attempting to hide behind the constitution.' appellant's right to a fair trial was damaged and violated his fourteenth amendment rights."
 {¶ 23} Appellant claims that the prosecutor engaged in misconduct in closing arguments by shifting the burden to the defense and implying defense counsel was trying to deceive the jury regarding the admissibility of appellant's videotaped statement. He also concludes that the misconduct deprived him of a fair trial. Specifically, appellant takes issues with the following underlined passages:
 {¶ 24} "[Prosecutor:] He knows his cousin isn't going to hurt him. He took * * * the killer of the drug dealer with him because he couldn't pull the trigger himself. But now he is scared of Ray Vaughn, the devil.
 {¶ 25} "What else did you learn? When you can't do anything else, youhide behind the Constitution and you waive [sic] the flag.
 {¶ 26} "[Defense counsel]: Objection.
 {¶ 27} "THE COURT: I will note your objection. It's closing arguments, but be careful.
 {¶ 28} "[Prosecutor]: I practice law every single day. TheConstitution is important. We use the Constitution daily, but we don'tstand here in front of you and waive [sic] a flag when we can't doanything else.
 {¶ 29} "What did we learn? That there is a discrepancy on how the rules of evidence should be applied. You did not see a videotape. There is hearsay statements included in a videotape, and you did not see it. You heard Detective Kelty tell you what the admissions were that were made. * * * There are evidentiary reasons you did not see the videotape,and [defense counsel] knows that.
 {¶ 30} "[Defense counsel]: Objection again, Your Honor.
 {¶ 31} "THE COURT: I will note it. I will note the objection." (Tr. 625-626).
 {¶ 32} First, it must be pointed out that these statements occurred in rebuttal, not in the state's initial closing argument. Defense counsel's closing had made sweeping pronouncements on the Constitution in an attempt to elucidate his point about vengeance and state-induced sympathy for the victim. For instance, defense counsel stated:
 {¶ 33} "[V]engeance is a wicked tongue. It is the snake and Eve, make no mistake. Only here it's the Constitution. It's what we hold so close to us, so dear. Ladies and gentlemen, hundreds of thousands of men and women have died defending the Constitution. And when it came down to it, they are willing to do it for a principle. I am not trying to stand on a soap box here, but consider this, and the principle is everything we embrace. It is the life blood of what our country is. And so now you throw in vengeance, and what is it to do? He is presumed innocent and they haven't proved purpose. He didn't take the stand, but they want you to infer. * * * [t]hey want you to infer a purpose * * *." (Tr. 603-604).
 {¶ 34} Defense counsel later continued:
 {¶ 35} "Regarding the Constitution, now, Mr. Lewis didn't take the stand, and sometimes I wonder does a jury want to cry out and say I know I told him if he doesn't take the stand it doesn't mean anything. You heard from Mr. Hoefler that said, well, I want to hear somebody say, and he was honest about it. You may say to yourself I want to hear him say not guilty. Ladies and gentlemen, he has implicitly said it to you because he is here. He can get up a million times and say not guilty. It doesn't make a difference. He has already said it. That's why we are here. He is saying I didn't do these terrible crimes. If he got up a million times and told it to you, it wouldn't make a difference because he has already done that." (Tr. 618).
 {¶ 36} Relevant to the state's comments on the videotape, defense counsel had previously tried to plant seeds of doubt in the jury's mind by questioning why the videotaped statement was not presented to the jury. He opined, "[y]ou missed twentysix minutes of the most important evidence in this trial. * * * You got to ask yourself why doesn't the State want you to see that?" (Tr. 608-609).
 {¶ 37} Contrary to appellant's complaint, the state's comments do not suggest some type of burden to be placed upon the defense. In fact, were it not for the objections drawing emphasis to them, the comments on the Constitution almost leave no impression on the reader, as they are vague and abstract. As the state notes, defense counsel is the one who first confusingly referenced the Constitution, focused on appellant's failure to testify, and basically testified for his client when counsel stated that by going to trial, he says he is not guilty.
 {¶ 38} The statements regarding evidentiary rules and the videotape were a response to a suggestion that the detective was lying about the videotape's contents and that there is some key evidence in the videotape which the state is hiding. As noted in assignment of error number six, where appellant raises issues surrounding the failure to introduce the videotape, the defense was not permitted to introduce the videotape as it contained hearsay statements of appellant.
 {¶ 39} The twofold test for prosecutorial misconduct is whether the prosecutor's conduct at trial was improper and whether it prejudicially affected the substantial rights of the defendant. State v. Lott (1990),51 Ohio St.3d 160, 165. A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. Thus, a reversal for prosecutorial misconduct is not warranted unless it is clear that the outcome of the trial would have been different but for the misconduct.State v. Smith (1984), 14 Ohio St.3d 13, 15.
 {¶ 40} In reviewing closing arguments for prosecutorial misconduct, we view the remarks in the context of the entire closing argument. State v.Treesh (2001), 90 Ohio St.3d 460, 480. Moreover, we must consider whether the alleged misconduct was "an isolated incident in an otherwise properly tried case." Smith, 14 Ohio St.3d at 15. Thus, we not only view the entire closing argument, but we also review the entire case and determine the effect of any problem on the trial as a whole. State v. Bryan,101 Ohio St.3d 272, 2004-Ohio-971, ¶ 151.
 {¶ 41} We also work under the premise that prosecutors should be given considerable latitude during closing arguments. State v. Mauer (1984),15 Ohio St.3d 239, 269. This latitude remains when a prosecutor is attempting to rebut statements made by the defense in closing.
 {¶ 42} When the comments are read in context with the entire closing argument as a whole and when the propriety of the prosecutor's conduct is considered throughout the case, it does not appear that the prosecutor's rebuttal comments are ones that would deprive appellant of a fair trial and prejudice his substantial rights. The effect of the statements reviewed above does not diminish the defense put on by counsel. As will be reviewed infra, there is substantial evidence of appellant's guilt which did not get improperly bolstered by these stray comments made in the state's rebuttal to the defense's closing.
 {¶ 43} Appellant also complains that the prosecutor shifted the burden to him by mentioning that he did not call a certain witness to bolster his claim that the detective was lying. Once again, the prosecutor's comment was made in rebuttal and must be read in context.
 {¶ 44} In closing arguments, defense counsel pronounced that the state's entire case relies on the testimony of one man, Detective Kelty. (Tr. 600). Defense counsel declared that Detective Kelty was lying about appellant's statement. (Tr. 608). Defense counsel implied that the state had other witnesses who would have contradicted Detective Kelty, stating:
 {¶ 45} "Did you hear from Detective Kelly who was supposedly there [for the second statement] on May 3? Did you hear from [prior defense counsel] who was supposedly there on May 3, 2002? No. You have to rely completely on Detective Kelty's testimony that he said this." (Tr. 606-607).
 {¶ 46} In rebuttal, the state responded:
 {¶ 47} "What did we just learn? * * * Detective Kelty is a liar. Did you see — did you hear who was present when that videotape — when that second confession was made? Who was present? Detective Kelty, Detective Kelly and [prior defense attorney]. Did you see them put her on the witness stand and tell you that Detective Kelty is lying? No, and why not? Because he is not lying." (Tr. 623).
 {¶ 48} The above contested statement by the prosecutor was a response to the accusations presented against it. By noting that appellant's second statement made in the presence of counsel was consistent with his uncounseled statement and that appellant's original counsel was not called as a witness to establish that the detective was lying "[b]ecause he was not lying," the prosecutor was attempting to rebut appellant's accusations against Detective Kelty. (Tr. 623).
 {¶ 49} Absolutely no objection was entered to these comments at a time when they could have been cured. Thus, any prosecutorial misconduct is waived absent plain error. State v. Blasdell, 155 Ohio St.3d 423,2003-Ohio-6392, ¶ 49, citing State v. White (1998), 82 Ohio St.3d 16, 22. Since the result of the trial would not have been different absent such statement, the plain error doctrine is inapplicable.
 {¶ 50} In Blasdell, the court was similarly confronted with a prosecutor's comments in closing regarding the defendant's failure to call a certain witness. Id. at ¶ 50-51 (overruling the defendant's argument). Here, we have the comment occurring only in a relevant rebuttal, which makes an even weaker appellate argument for the defense.
 {¶ 51} Read in the context of the entire closing argument, including the passages reviewed above, appellant's right to a fair trial was not affected by the disputed portions of the state's rebuttal. Thus, even if he had timely objected, his rights were not substantially affected. For the above reasons, this assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER THREE {¶ 52} Appellant's third assignment of error contends:
 {¶ 53} "The trial court committed an abuse of discretion when it excused juror No. 10 for cause in violation of Batson v. Kentucky
(1986), 476 U.S. 79, thereby denying appellant his right to equal protection under the fourteenth amendment of the United States Constitution."
 {¶ 54} Appellant notes that Batson prohibits the state from exercising a peremptory challenge in a racially discriminatory manner and, thus, the trial court should also be prohibited from excusing a juror for cause in a racially discriminatory manner. Appellant states that Juror Number 10 was only one of two African-Americans on the panel. Appellant concludes that the court should not have excused an African-American juror for cause when appellant was African-American and the victim was white. Appellant states that the court should have at least questioned the juror further before sua sponte deciding that he would be hostile, unfair, and partial.
 {¶ 55} After the trial court asked the prospective jurors various questions, the court focused on Juror Number 10. It was eventually revealed that this juror's nephew was a victim of homicide and that no one was ever charged with the crime. He opined that he did not believe the Youngstown Police did everything they could to investigate the crime. (Tr. 65). He stated that he could not put his feelings out of his mind in this case. He disclosed that he did not want to serve on this jury. When asked if he would stay and listen to the evidence, he advised that he would stay but "I don't know what I would think about it." Whenasked if he could be fair and impartial, he twice said that he couldnot. (Tr. 66). When asked why, he responded in a confusing manner, interpreted by the trial court as referring to the use of weapons. (Tr. 66-67).
 {¶ 56} The court continued to question the prospective jurors. Before allowing the prosecutor and defense counsel to voir dire the prospective jurors, a side bar was called off the record. (Tr. 84). The court then came back on the record and excused two jurors for cause, including Juror Number 10. (Tr. 85).
 {¶ 57} Defense counsel objected, and the objections were later argued on the record. (Tr. 126). The court stated, "I believe that [Juror Number 10] was going to be somewhat hostile and perhaps even indicated that he could not be fair and impartial in hearing the facts of the case." The state agreed, "Once we started discussing his nephew being killed, hostile is a good word. He became incredibly hostile." (Tr. 127).
 {¶ 58} The court also noted that Juror Number 10 never indicated that a member of his family had been a victim of crime even though the court had specifically asked the prospective panel such a question. (Tr. 127-128). Defense counsel said that if the state was requesting Juror Number 10 be dismissed for cause, then he objected based upon Batson
since Juror Number 10 was one of the only two African-American prospective jurors. (Tr. 128-129).
 {¶ 59} Initially, we note that it does not appear on the record that the state actually challenged the juror for cause. It seems the court may have sua sponte found that the juror should be removed for cause, which is permissible. See State v. Smith (1997), 80 Ohio St.3d 89, 105.
 {¶ 60} Next, we must point out that the United States Supreme Court case of Batson v. Kentucky applies to peremptory challenges, not challenges for cause. (1986), 476 U.S. 79. See, also, State v. Herring
(2002), 94 Ohio St.3d 246, 256. These cases specifically state that the race-neutral explanation required by Batson need not rise to the level justifying the exercise of a challenge for cause. Id. The reason theBatson test was set forth was because there was no test for peremptory challenges.
 {¶ 61} A challenge for cause has its own test, the elements of which are not actually raised herein. This should lead to a discussion of the true test for exercising challenges for cause. However, appellant does not focus on this test since he is preoccupied with the Batson holding. Still, we shall review the challenge for cause process.
 {¶ 62} "A prospective juror is not automatically disqualified by the fact that a close relative has been the victim of a crime similar to the crime on trial." State v. Murphy (2001), 91 Ohio St.3d 516, 525. Rather, Crim.R. 24(B)(9) instructs the trial court to consider each case on its own merits and determine whether the prospective juror is "possessed of a state of mind evincing enmity or bias." See, also, Murphy,91 Ohio St.3d at 525.
 {¶ 63} Moreover, R.C. 2313.42(J) provides that there is good cause for removal of a juror if his answers indicate he cannot be fair and impartial or he will not follow the law. The court is instructed to sustain a challenge to a juror if the court has any doubt that the juror will be entirely unbiased. R.C. 2313.43.
 {¶ 64} The court's ruling on a challenge for cause shall not be overturned on appeal if the decision is reasonably supported by the record. Murphy, 91 Ohio St.3d at 526. The court views the panel as they answer its inquiries; the court occupies the best position to evaluate the credibility of each prospective juror as they voice their partiality or lack thereof. Id.
 {¶ 65} Here, the transcript as reviewed supra supports the trial court's decision to excuse Juror Number 10 for cause. Juror Number 10 had a nephew who was murdered, but he failed to disclose to the court when the panel was asked this general question. This juror expressed anger at the Youngstown Police Department for the manner in which they investigated his nephew's murder. He expressed an inability to deal with crimes involving firearms and stated twice that he could not be fair and impartial. Thus, part of the reason he was excused was based upon his refusal to be fair and impartial to appellant himself.
 {¶ 66} We also note that counsel did not attempt to rehabilitate this prospective juror at a time when such was possible; rather, he followed the court's suggestion to wait until later to put his objection on the record. Regardless, the court could reasonably find that this juror could not be rehabilitated in the court's mind after what the court had already heard. As the state revealed in their arguments below, the trial court heard hostility from this witness that does not translate for the purpose of appellate review. As such, the trial court's decision on this matter is upheld.
 {¶ 67} Even assuming merely for the sake of argument that a challenge for cause should have been denied because of insufficient opportunity to rehabilitate, any error would have been harmless because the state would have used its final peremptory challenge on Juror Number 10. (Tr. 231). In doing so, any potential Batson challenge would have been properly overruled under the following analysis.
 {¶ 68} Batson has three parts. Herring, 94 Ohio St.3d at 255. First, the defendant must make a prima facie case or raise an inference of discrimination. Id. The state concedes that this element would have been satisfied. Second, the state must rebut this inference by voicing a racially neutral explanation. Id. at 256. Here, the state voiced a racially neutral explanation by noting that Juror Number 10 admitted he could not be fair and impartial and voiced hostility in general and towards the Youngstown Police Department in the investigation of his nephew's homicide. Third, the trial court then uses it discretion to make credibility determinations and decide whether it believes the racially neutral explanation. Id. (noting that the burden of persuasion would be on the opponent of the challenge).
 {¶ 69} Under the facts and circumstance herein, there is no reason for this court to interfere with the trial court's use of its discretion to believe the state's explanation. The trial court's finding is entitled to deference since it is based upon credibility determinations. Id. at 257. In fact, the trial court specifically found that the prospective juror's attitude was hostile and that his answers indicated his inability to be fair. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FOUR {¶ 70} Appellant's fourth assignment of error provides:
 {¶ 71} "Appellant was denied due process under the fourteenth
amendment due to the fact he was found guilty when said conviction was not based upon sufficient evidence displaying appellant's guilt beyond a reasonable doubt and the jury's verdict was inconsistent with the evidence and testimony presented at trial."
 {¶ 72} Appellant raises issues of weight and sufficiency under this assignment of error. The concepts are distinct and will be addressed separately. See State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Sufficiency of the state's evidence is a legal question involving an inquiry into whether the evidence was adequate to even submit the case to the jury. Id. at 386. In determining sufficiency, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact-finder could find the essential elements proven beyond a reasonable doubt. Id. See, also, State v. Goff (1998), 82 Ohio St.3d 123,128, 694 N.E.2d 916.
 {¶ 73} The elements of aggravated robbery relevant in this case are: inflicting, or attempting to inflict, serious physical harm on Justin Treasic while attempting or committing a theft offense or in fleeing immediately after the attempt or offense. R.C. 2911.01(A)(3).
 {¶ 74} The elements of aggravated murder involved herein are: purposely causing the death of Justin Treasic while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated robbery. R.C. 2903.01(B).
 {¶ 75} The elements required to prove a firearm specification include: having a firearm on or about the offender's person or under the offender's control while committing the offense and displaying the firearm, brandishing the firearm, indicating that the offender possessed the firearm, or using it to facilitate the offense. R.C. 2945.145(A).
 {¶ 76} Appellant was found guilty of complicity in the above offenses. The elements involved for this complicity are: aiding or abetting another while acting with the culpability required for commission of the offense. R.C. 2923.03(A)(2).
 {¶ 77} Here, there is no dispute that a firearm was used to kill Justin Treasic. A rational person could find that serious physical harm was inflicted on Justin during an attempted theft offense. In fact, appellant really only disputes his presence at the scene and/or his culpable mental state.
 {¶ 78} As for his presence, the jury had before it multiple sources from which to conclude that appellant was in the car that led Justin to his death. First, two witnesses saw Justin leave an apartment on Pennsylvania Avenue in Youngstown and enter a car generally fitting the description of the car purchased and used by appellant (although in his girlfriend's name). (Tr. 298, 359-360, 486-487). Evidence demonstrated that appellant previously purchased marijuana from Justin.
 {¶ 79} Evidence established that numerous telephone calls had been made to Justin's cellular telephone from appellant's residence in the hours and minutes before Justin was picked up. A witness heard Justin receive a telephone call at the time a call was placed from appellant's residence; this witness then noticed that the call prompted appellant to leave the apartment and approach the vehicle.
 {¶ 80} Two witnesses noticed that the passenger seat was empty but a passenger was sitting in the back passenger seat. (Tr. 299, 362). As for intent, one could reasonably infer from this seating arrangement that there was at least a plan to hold Justin at gun point.
 {¶ 81} Justin was killed shortly after he left the apartment. (Tr. 297, 316). He was found with his pockets inside out. A car fitting the description of appellant's vehicle was seen leaving the scene of the murder. (Tr. 332). Moreover, appellant twice made incriminating statements to police establishing his presence in the vehicle and at the murder scene. (Tr. 447, 506). He also admitted setting up a drug deal with Justin.
 {¶ 82} In his first statement, appellant initially claimed that he let his cousin, Vaughn, use his car. (Tr. 446). He then changed his story and admitted he drove his cousin to and from the scene of the shooting. (Tr. 447). In his second statement made some weeks later, appellant admitted that he entered into a plan with Vaughn to rob Justin of his marijuana. (Tr. 448, 501). Appellant's codefendant is his cousin, with whom he smoked the stolen marijuana after the murder and robbery. (Tr. 502). Finally, appellant's girlfriend testified to Vaughn's telephone call advising appellant to watch the news story on the shooting. (Tr. 554).
 {¶ 83} There is plenty of evidence to establish appellant's presence at the scene. The real question revolves around evidence of intent to establish appellant's complicity. Aiding and abetting is defined as assisting or facilitating the commission of a crime or promoting its accomplishment. State v. Johnson (2001), 93 Ohio St.3d 240, 243, citing Black's Law Dictionary (7 Ed.Rev. 1999) 69. The mere presence of the defendant at the crime scene is insufficient in itself to prove aiding and abetting. Id. citing State v. Widner (1982), 69 Ohio St.3d 267, 269.
 {¶ 84} However, merely because there is no proof that a defendant articulated his intent will not invalidate his conviction. Id. at 245. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." Id. quoting State v. Pruett (1971), 28 Ohio App.2d 29, 34. As the Supreme Court succinctly concluded in Johnson:
 {¶ 85} "[T]o support a conviction for complicity for aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstance surrounding the crime." Id. at 245-246.
 {¶ 86} Here, there are several reasons to conclude that appellant was more than merely present at the crime scene. First, appellant was not a passive passenger. Rather, he was the driver. Moreover, appellant's telephone was used to set up the drug deal. Appellant encouraged Justin to enter the vehicle, and he drove to a location as instructed by his cousin. Also, as aforementioned, the seating arrangement when appellant picked up Justin implied some type of plan to hold Justin at gun point. As the Ohio Supreme Court held, appellant's conduct before, during, and after the offense are all relevant to judge his culpable mental state. Id. at 245.
 {¶ 87} Some testimony showed that appellant not only set up the drug deal, encouraged Justin to enter the vehicle, and drove him to his death, but also that he watched Justin on his hands and knees begging for his life, waited for the shooter (his cousin) to shoot Justin, drove the shooter from the scene to a store to purchase cigars, and then smoked the stolen marijuana with the shooter. Viewing this and all of the other aforementioned evidence in the light most favorable to the state, some rational juror could find that appellant possessed the requisite mental state to establish his complicity in the offenses. We thus move to weight of the evidence.
 {¶ 88} It is the job of the fact-finder to weigh the evidence and determine whether the greater amount of credible evidence sustains the issue to be established. Thompkins, 78 Ohio St.3d at 387. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." Id. "Weight is not a question of mathematics, but depends on its effect in inducing belief." Id.
 {¶ 89} In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. at 387, 389 (noting that an appellate court's reversal on weight of the evidence grounds can only be accomplished by a unanimous three-judge panel in a criminal jury trial). See, also, Const. Art. 4, § 3(B)(3). The appellate court's discretionary power to grant a new trial on these grounds should only be exercised in the exceptional case where the evidence weighs heavily against the conviction. Thompkins,78 Ohio St.3d at 387.
 {¶ 90} This strict test acknowledges that credibility is generally the province of the jury who sits in the best position to assess the weight of the evidence and credibility of the witnesses whose gestures, voice inflections, and demeanor are personally observed. State v. Hill (1996),75 Ohio St.3d 195, 205; State v. DeHass (1967), 10 Ohio St.2d 230, 231. See, also, Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77,80. Where there are two fairly reasonable views or explanations, we do not choose which one we prefer. State v. Black, 7th Dist. No. 03JE1, 2004-Ohio-1537, ¶ 18. Rather, we defer to the trier of fact unless the evidence weighs so heavily against conviction that we are compelled to intervene. Id.
 {¶ 91} Here, we do not believe that the jury's verdict is contrary to the manifest weight of the evidence. The jury did not clearly lose its way and create a manifest miscarriage of justice. Rather, they drew acceptable inferences from the evidence presented. In accordance, this court refuses to sit as the "thirteenth juror." This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER FIVE {¶ 92} Appellant's fifth assignment of error contends:
 {¶ 93} "The appellant's trial counsel was ineffective in her representation of appellant by failing to safeguard appellant's statutory and constitutional rights."
 {¶ 94} Appellant complains about two actions of his original counsel who withdrew after going on sick leave from her employment. He contends that the two occurrences discussed infra establish ineffective assistance of counsel requiring reversal of his conviction.
 {¶ 95} In order to prevail on a claim of ineffective assistance of counsel, the defendant has the burden to establish two things: (1) that counsel's performance was deficient, and (2) that counsel's deficiency prejudiced the defense. State v. Reynolds (1998), 80 Ohio St.3d 670, 674, citing Strickland v. Washington (1984), 466 U.S. 668, 687. Counsel's performance is deficient if it falls below an objective standard of reasonableness. Id. The defendant must produce evidence that counsel acted unreasonably by substantially violating essential duties owed to the client. State v. Sallie (1998), 81 Ohio St.3d 673, 674. Because attorneys are presumed competent, reviewing courts must refrain from second-guessing strategical, tactical decisions and strongly assume that counsel's performance falls within a wide range of reasonable legal assistance. State v. Carter (1995), 72 Ohio St.3d 545, 558. See, also,State v. Burley (Aug. 11, 1998), 7th Dist. No. 93CA204 (a defendant is not guaranteed the right to the best or most brilliant counsel).
 {¶ 96} Upon demonstrating counsel's deficient performance, the defendant then has the burden to establish prejudice to the defense as a result of counsel's deficiency. Reynolds, 80 Ohio St.3d at 674. The reviewing court looks at the totality of the evidence and decides if there exists a reasonable probability that, were it not for serious errors made, the outcome of the trial would have been different.Strickland, 466 U.S. at 695-696. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
 {¶ 97} First, appellant complains that counsel permitted him to be interrogated by two detectives on May 3, 2002 without securing a plea deal. There is no evidence that counsel failed to secure an offer of a plea in return for the second interrogation. In fact, the record refers to multiple offers, ending with involuntary manslaughter. Moreover, appellant had already incriminated himself. As analyzed under the first assignment of error, his first incriminating statement was not required to be suppressed. Thus, prejudice in the second statement is not established under the arguments set forth in appellant's brief. As appellant concedes, counsel is a seasoned criminal defense attorney. We shall not second guess her chosen tactics under the circumstances presented herein.
 {¶ 98} Next, appellant complains that his original counsel sent a replacement to attend the deposition of the deputy coroner. First, we note that the state discovered that the coroner was moving to Florida for a new job. The filings establish that the state's motion for a deposition was filed on June 27, 2002, the court granted the motion that same day, and the coroner was moving on June 30, 2002. This explains why defense counsel did not ask to continue the deposition. An attorney in such a situation does not act deficiently by sending a replacement to the deposition.
 {¶ 99} Appellant complains that the replacement was not qualified, but his brief does not specify how she was not qualified. Upon reading the transcript, it appears he is referring to whether the replacement met the criteria for a local court-appointment list for aggravated murder cases. (Tr. 412). Whether she actually failed to meet those criteria is not on the record, and cannot be determined on direct appeal.
 {¶ 100} Nevertheless, we have stated, "counsel is not presumed ineffective merely because he does not meet the court-appointed counsel qualifications imposed by the Mahoning County Bar Association's Indigent Public Defense Committee." State v. Reed, 7th Dist. No. 03MA77, 2004-Ohio-1544, ¶ 31. We also noted that Mahoning Cty. Loc. Crim.R. 4 also allows a judge to appoint a non-certified attorney in a specific case if it has been demonstrated to the judge that competent representation can be provided. Id.
 {¶ 101} Here, specifics as to how appellant was prejudiced (by having an attorney at a deposition who may not be on the pre-approved court-appointment list) were not presented to the trial court or this court. Counsel did not point to any particular problems with replacement counsel's conduct or omissions. Finally, as the state points out, the cause of death in this case did not appear to be in dispute and, thus, appellant fails to establish a reasonable probability of outcome-determinative prejudice. This assignment of error is overruled.
 ASSIGNMENT OF ERROR NUMBER SIX {¶ 102} Appellant's sixth and final assignment of error provides:
 {¶ 103} "The trial court committed a series of errors in its various rulings. although the errors committed during trial singularly may not rise to the level of prejudicial error, the cumulative effect of the errors deprived appellant of the constitutional right to a fair trial."
 {¶ 104} The doctrine of cumulative error provides that although a particular error may not constitute prejudicial error in and of itself, the cumulative effect of various errors may deprive a defendant of a fair trial and constitute cause for reversal. State v. DeMarco (1987),31 Ohio St.3d 191, 196-197 (speaking of multiple instances of inadmissible hearsay). A defendant claiming cumulative error must thus show multiple instances of harmless error and persuasively establish a reversible cumulative effect. See State v. Sanders (2001),92 Ohio St.3d 245, 279; State v. Garner (1995), 74 Ohio St.3d 49, 64.
 {¶ 105} Appellant generally points to the arguments made in the preceding assignments of error and then specifically outlines six other allegations of error. First, he complains that the trial court allowed appellant's case to be unconsolidated from William Vaughn's case without granting appellant a continuance to sufficiently prepare his defense.
 {¶ 106} In October 2002, the state filed a motion to consolidate the trials. Both defendants had objected to consolidation. They argued that the state waited too long to seek joinder, the admission of a codefendant's confession would violate the right to confrontation, and the codefendants had antagonistic defenses. On November 6, 2002, the court granted the state's motion to consolidate the trials.
 {¶ 107} On January 16, 2003, appellant filed a motion to suppress the statement of codefendant Vaughn, restating some of the arguments made in his objection to consolidation. On the morning of January 21, 2003, just before the scheduled trial, the court held a hearing on this motion and others.
 {¶ 108} At the hearing, the codefendant also reiterated his prior arguments against consolidation. The state then agreed to withdraw its motion to consolidate the trials in order to avoid the defendants' constitutional arguments. The state asked to try appellant first, specifically that same day, as originally scheduled.
 {¶ 109} Appellant's counsel agreed but asked for a continuance due to a need to reevaluate his trial tactics. The court agreed to continue the case until the next day at 1:00 p.m. Appellant's counsel urged that this was not enough time to "retool." By way of explanation, he stated that with consolidated trials he believed that his client's statement would not be introduced to avoid violating codefendant Vaughn's confrontation rights. The court responded that the prior decision allowed a redacted statement (so that each defendant's statement did not incriminate the other defendant), and did not suggest a completely excluded statement. The court then extended the continuance until January 23, 2003.
 {¶ 110} Appellant's counsel did not further complain or object. (Jan. 21, 2003 Tr. 44). He had not previously suggested what he thought a reasonable continuance would be. Thus, when the court granted an extension of its continuance and counsel failed to complain, it appears he was satisfied with the extra time given. This is especially true where his reasons were merely to "retool" his strategy and where he already had his schedule cleared based upon the previously scheduled trial of this case As such, there was no error, harmless or otherwise, in granting this continuance and the extension thereof.
 {¶ 111} Second, appellant argues that Edward Whitaker's testimony contained inadmissible hearsay. Specifically, appellant takes issue with this witness's testimony as to statements made by Justin about appellant. For instance, Justin told Mr. Whitaker that he met a person with "white pigment marks around his mouth" at the gas station, that he called him "Freddie the Drooler," and that he sold this person marijuana. (Tr. 294-295). Defense counsel objected on hearsay grounds. The state advised that this testimony was going to come in later regardless. (Tr. 292).
 {¶ 112} This witness also testified that on the day of Justin's murder, he heard Justin speaking to "Freddie the Drooler" on the telephone and Justin said he was going to sell marijuana to him. (Tr. 296-297). Defense counsel objected. (Tr. 296).
 {¶ 113} First, we note that there are hearsay exceptions for cases where the declarant is unavailable. Evid.R. 804. Justin is an unavailable declarant since he has been murdered. Evid.R. 804(A)(4). Justin's contested statements "so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." See Evid.R. 804 (B)(3). Because a reasonable person does not disclose that they just sold marijuana at a gas station or that they are about to sell more marijuana unless their statements are true and because corroborating circumstances clearly indicate the trustworthiness of the statements, Justin's statements disputed above do not constitute hearsay.
 {¶ 114} Regardless, the state argues that these admissions of hearsay were harmless. Appellant expressly confirmed the disputed statements. For instance, he admitted purchasing marijuana from Justin at the gas station a couple weeks before the murder. Moreover, appellant admitted setting up a marijuana buy with Justin on the day of Justin's murder and picking Justin up at the apartment where Mr. Whittaker lived. The detective testified that appellant made these admissions to him at the station. (Tr. 446-447). Also, appellant's girlfriend testified that in February 2002, she gave appellant money to buy marijuana from a person he met at the gas station. (Tr. 549).
 {¶ 115} Thus, Mr. Whittaker's testimony about statements made by the victim was cumulative of other testimony. See State v. O'Neal (2000),87 Ohio St.3d 402, 411 (hearsay from murder victim harmless where it duplicated other testimony and defendant had confessed). Appellant's statement to police was admissible as an admission by a party-opponent and did not constitute hearsay. See Evid.R. 801(D)(2)(a). His statement duplicated the testimony of Mr. Whitaker. Hence, even if there was error, it was harmless. See Crim.R. 52(A) (court shall disregard any error that does not affect substantial rights).
 {¶ 116} Third, appellant restates his arguments made to the trial court surrounding the videotaped deposition of the deputy coroner's testimony. He contends that it violated his right to confrontation. He again notes his argument that replacement counsel at the deposition may have been "incompetent." He also argues that the coroner's testimony should not have been admissible where he offered to stipulate to cause of death and that his offer caused the probative value of the deposition to be outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury under Evid.R. 403(A).
 {¶ 117} Initially, we refer to our analysis under appellant's fifth assignment of error complaining about replacement counsel. As noted, appellant does not specify what replacement counsel did or failed to do that was deficient or prejudicial. Next, we hold that his confrontation rights were not violated by the mere fact that a deposition was used at trial.
 {¶ 118} Pursuant to Crim.R. 15(A), the court shall permit a deposition of a witness if he is unable to attend the trial and his testimony is material and necessary to prevent a failure of justice. The court allowed the deposition of the deputy coroner to be taken in this case without objection. Under Civ.R. 15(F), this deposition can be used at trial if the witness is out of state. As such, Crim.R. 15 allowed the taking and use of this deposition.
 {¶ 119} The Ohio Supreme Court has agreed that confrontation rights are not violated by such deposition if the defendant and his counsel had the opportunity for confrontation during the deposition. State v. Smith
(2000), 87 Ohio St.3d 424, 432; State v. Phillips (1995), 74 Ohio St.3d 72,95. The Court reasoned:
 {¶ 120} "It is irrelevant that the face-to-face confrontation occurred during the deposition rather than during trial. What is important is that the confrontation occurred as Dr. Klein testified, since a witness is less likely to lie, or to lie convincingly, in the physical presence of the accused." Phillips (1995), 74 Ohio St.3d 72, 95.
 {¶ 121} Finally, the state is not obligated to accept the defense's offer to stipulate to cause of death. State v. Simpson, 2d Dist. No. 19797, 2004-Ohio-669, citing State v. Free (Feb. 13, 1998), 2d Dist. No. 15901. See, also, State v. Van Hook (May 13, 1980), 1st Dist. No. C-85-0565. In fact, the Supreme Court has held that a stipulation to cause of death does not make autopsy and murder scene photographs inadmissible per se. State v. Jalowiec (2001), 91 Ohio St.3d 220, 229, citing State v. Maurer (1984), 15 Ohio St.3d 239, 265. Here, there is no specification as to any prejudice from the deposition or any suggestion that photographs displayed during the deposition are at issue. Thus, this argument is overruled.
 {¶ 122} Fourth, appellant complains that Detective Kelty testified he seized a box of 30/30 ammunition and an empty pistol holder. (Tr. 442). Before he so testified, the defense unsuccessfully objected. (Tr. 441). Defense counsel tried to get the detective to state that the items seized were not relevant. But, the detective's "yes" answer to the relevancy question was ambiguous. (Tr. 490).
 {¶ 123} Appellant now states that the empty pistol holder and the ammunition are not relevant, and if they are, then their probative value is substantially outweighed by chances of the unfair prejudice. Contrary to this claim, the empty pistol holder is relevant. The detective testified that appellant referred to Vaughn's use of a pistol in the murder. One could infer that appellant's empty pistol holder previously held a pistol, maybe even the pistol used for this murder. Reasonable inferences are permissible and usual in criminal cases. Of course the pistol holder is prejudicial; that is the typical nature of the state's evidence in a criminal trial. The probative value of its existence in appellant's room is not outweighed by unfair prejudice.
 {¶ 124} Whether 30/30 ammunition is irrelevant has not been demonstrated to this court as appellant does not point where in the transcript it states what type of ammunition was used to kill Justin. Furthermore, reversible prejudice from telling the jury that appellant had ammunition in his home would not be apparent since testimony concerning the empty pistol holder was properly admitted anyway.
 {¶ 125} Fifth, appellant argues that his entire videotaped confession should have been played for the jury so that they could hear where he claims that Vaughn forced him to participate. The state did not introduce the videotaped statement. Rather, they questioned Detective Kelty about what appellant told him.
 {¶ 126} Appellant cites Evid.R. 106 in support of his claim. This rule provides that when part of a recording is introduced, the adverse party may require introduction of any other part otherwise admissible and which in fairness ought to be considered. Firstly, no recording was introduced. The detective was present at the interview, and a recording just happened to have been made. The Staff Note to Evid.R. 106 warns that the rule applies to writings and recordings, not conversations. Secondly, this rule is limited to other parts of the recording that are "otherwise admissible."
 {¶ 127} Here, the state could ask the detective to testify as to what appellant told him under Evid.R. 801(D)(2)(a), which provides that a statement is not hearsay if it is offered against a party and is his own statement. This rule explicitly demonstrates that appellant's statement is admissible non-hearsay only if it is offered by the state. See, also, 1980 Staff Note. Thus, appellant cannot use this rule to offer his own out of court statement. In re Coy (1993), 67 Ohio St.3d 215, 218
(pointing to this bar and the Staff Note); State v. Wilson, 12th Dist. No. CA2001-09-072, 2002-Ohio-4709, ¶ 57 (defendant cannot offer exculpatory hearsay statement); State v. Gatewood (1984),15 Ohio App.3d 14, 16 (holding that the defendant is not entitled to introduce taped interview with police).
 {¶ 128} This prohibition has been explained partly by way of the state's right to cross-examine the declarant. State v. Vidu (July 23, 1998), 8th Dist. Nos. 71703, 71704. If the defendant does not take the stand, he cannot introduce his own statements made in a videotaped statement unless he can point to a hearsay exception. Id.
 {¶ 129} Even though the tape is admissible if offered by the state, the state is not obligated to play it. State v. Scales, 2d Dist. No. 2002CA27, 2004-Ohio-175, ¶ 9. Instead, the state can ask the interviewing officer to testify about the defendant's statements. Id.
 {¶ 130} In accordance, appellant's statements to police that were notoffered by the state are inadmissible hearsay unless some exception is found to apply. See Vidu, 8th Dist. Nos. 71703, 71704. Appellant does not cite us to any listed hearsay exception. Yet, we shall still review some evidentiary options.
 {¶ 131} The statement against interest exception is inapplicable because appellant claims the portion of the statement he wishes to introduce is exculpatory and because such exception does not apply to statements of the parties themselves. See Evid. R. 804(B)(3) and its Staff Note. See, also, Gatewood, 15 Ohio App.3d at 15. Nor can we find any other hearsay exceptions that apply in this case. See Wilson, 12th Dist. No. CA2001-09-072, at ¶ 58.
 {¶ 132} Although appellant does not raise it here, he argued below that the videotape was the "best evidence" under Evid.R. 1002. We have previously held that when a person testified from memory about a conversation they had with a defendant that just happened to be recorded, they are not attempting to prove the contents of the recording. State v. Cechura (May 8, 2001), 7th Dist. No. 99CO74. Thus, the best evidence is not applicable where an officer testifies as to what he heard first-hand. Id.
 {¶ 133} Finally, we point out that appellant was eventually permitted to ask the detective if appellant claimed that Vaughn pulled a pistol on him. (Tr. 480-482). Thus, he actually did introduce his exculpatory hearsay statement. This argument is overruled.
 {¶ 134} Sixth and last, appellant complains that the trial court refused to add his requested language to the jury instruction on aiding and abetting. Appellant objected to the portion of the court's instruction which read:
 {¶ 135} "To support a conviction for complicity by aiding or abetting, the evidence must show that the defendant shared the criminal intent of the principal. Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed."
 {¶ 136} This is a proper statement of the law. State v. Johnson
(2001), 93 Ohio St.3d 240, 245. Still, appellant asked the court to state that the inference is nonconclusive and to add, "However, mere association with the one who perpetrates an unlawful act does not render a person a participant in a crime." (Tr. 655). Appellant concludes that without this addition, the instruction was confusing and allowed the jury to convict merely by finding that appellant was associated with Vaughn.
 {¶ 137} When reviewing allegations of omission from jury instructions, the entire jury charge must be considered. A jury instruction must be viewed in the context of the overall charge, rather than in isolation. State v. Getsy (1998), 84 Ohio St.3d 180, 196, citingState v. Thompson (1987), 33 Ohio St.3d 1, 12-13.
 {¶ 138} The court's complicity instruction was more detailed than suggested by appellant. The court warned that the jury must find that appellant had a specific intention to aid or abet another in causing Justin's death and that he shared the criminal intent of the principal. (Tr. 636, 640). The court detailed the requirements for finding the culpable mental state of purposely as related to aggravated murder and knowingly as related to aggravate robbery. (Tr. 636-639). The court defined aid or abet as "help, assist, strengthen, encourage, counsel or incite." (Tr. 637).
 {¶ 139} As stated above, the court advised that participation in criminal intent can be inferred from presence, companionship and conduct before and after the offense is committed. (Tr. 641). Moreover, the court had already advised:
 {¶ 140} "To infer or to make an inference is to reach a reasonable conclusion or deduction of fact which you may but are not required to make from other facts which you find have been established by direct evidence. Whether an inference was made rests entirely with you." (Tr. 631-632).
 {¶ 141} The Supreme Court has held that an advisement on mere association and specific intent is essentially the same as an advisement that the presence inference in non-conclusive. State v. Coleman (1988),37 Ohio St.3d 286 (where the Supreme Court upheld the trial court's instruction on mere association after the trial court refused to specify that the inference from presence is non-conclusive). Here, the court basically instructed that an inference is non-conclusive by stating that the jury is not required to make the available deductions of fact and that the decision to infer is totally up to the jury.
 {¶ 142} The jury knew they had to find that appellant had the specific intent possessed by Vaughn and that he helped, assisted, strengthened, encouraged, counseled, or incited Vaughn. Just because the jury was charged that appellant's presence can be used to draw an inference does not mean that the jury was led to believe that presence or association per se constitutes aiding or abetting.
 {¶ 143} The court's instruction was an accurate statement of the law. The jury was fully advised that specific intent was necessary, that appellant had to assist or encourage Vaughn, and that an inference based upon presence or association is permissible but not required. Although an addition of language that "mere association with the principal does not render one a participant" may have been preferable, its absence is not reversible error. See State v. Soto (Jan. 22, 1998), 8th Dist. No. 72062; State v. Adair (Nov. 18, 1986), 10th Dist. No. 86AP-23.
 {¶ 144} In accordance with all of the above statements, cumulative error has not been established. This assignment of error is therefore overruled.
 {¶ 145} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, P.J., concurs. Waite, J., concurs.