[Cite as *State v. Miklas*, 2012-Ohio-2584.]

STATE OF OHIO, BELMONT COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | CASE NO. 11 BE 1 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| ROBERT L. MIKLAS, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from Common Pleas
                             Court, Case No. 08 CR 170.

JUDGMENT:                    Affirmed.

APPEARANCES:
For Plaintiff-Appellee:      Attorney Chris Berhalter
                             Prosecuting Attorney
                             Attorney Daniel P. Fry
                             Asst. Prosecuting Attorney
                             147-A W. Main Street
                             St. Clairsville, OH  43950

For Defendant-Appellant:     Attorney Joseph Vavra
                             132 West Main Street
                             P.O. Box 430
                             St. Clairsville, OH  43950

JUDGES:
Hon. Mary DeGenaro
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated:  June 6, 2012

DeGenaro, J.

{¶1} Defendant-Appellant, Robert Louis Miklas, appeals the decision of the Belmont County Court of Common Pleas, convicting him of two counts of rape and sentencing him accordingly. On appeal, he contends that his confession was involuntary because it was induced by coercive police tactics, such that the trial court erred in overruling his motion to suppress that evidence. He also argues that his convictions were against the manifest weight of the evidence. Miklas's arguments are meritless. Based upon the totality of the circumstances, Miklas's confession was not involuntary; thus, the trial court did not err in overruling his suppression motion. Furthermore, his convictions were not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶2} On June 4, 2008, Miklas was indicted by the Belmont County Grand Jury on two counts of rape (R.C. 2907.02(A)(1)(b)), a first-degree felony. These charges stemmed from sexual conduct that occurred between Miklas and his stepdaughter, T.N., when she was between eight and ten years old.

{¶3} On February 25, 2009, Miklas filed a motion to suppress all evidence obtained by the State on May 1, 2008 because the evidence was not voluntarily given. He contended that on that date, he went to the Ohio Bureau of Criminal Investigation in order to take a polygraph test. He claimed that during the pre-polygraph interview, the officer told him that if he wanted to be with his family, he would need to make statements consistent with T.N.'s allegations. He alleged that the officer coerced him into changing a written statement to make it incriminating and that the officer made alterations to a drawing indicating the commission of a crime.

{¶4} On March 9, 2009, the matter came for a suppression hearing before the court. The State called Agent Steve Burke, who testified that in May 2008, he was a certified polygraph examiner with the Ohio Bureau of Criminal Investigation. The investigating officer, Detective Allar, had made arrangements for Miklas to come to the

Cambridge office on May 1, 2008 so that Agent Burke could administer a polygraph test. Agent Burke explained that he administered written *Miranda* warnings to Miklas before any questioning or pretest interviewing began. He identified State's Exhibit 1 as a photocopy of the *Miranda* rights form that he read as Miklas followed along, and then Miklas signed the form. The agent did not get any indication that Miklas did not understand this form. Agent Burke then conducted a pretest interview to explain to Miklas what he was there for and to explain the testing procedure.

{¶5} Agent Burke explained that Miklas did not complete a polygraph test because during the pretest interview, he made admissions to the facts of the case. Based on these admissions, the agent asked Miklas if he wanted to write a letter of apology to T.N., and Miklas said that he did. Agent Burke identified State's Exhibit 2 as photocopies of the letters of apology that Miklas wrote. He stated that the first page of Exhibit 2 was the letter that Miklas initially wrote. The agent said that he advised Miklas during the pretest interview that the allegations were that Miklas put ice on or in T.N.'s vagina, on her breasts, and squirted water in her vagina. However, Agent Burke explained that the letter Miklas wrote on page one was ambiguous regarding the allegations.

{¶6} Agent Burke testified that he asked Miklas if he would clarify what he wrote in the initial letter because it was ambiguous. For example, Agent Burke explained that in the initial letter, Miklas wrote "I'm sorry for what I did to you," and the agent asked him to specify what he did. Miklas wrote page two and at that point, he wrote, "Putting ice on you." Regarding the phrases added on page two, such as "[i]ce in the vagina, water in the vagina," Agent Burke explained that he asked Miklas what he meant by what he wrote and if he wished to clarify what he meant. The agent testified that the letter on page two was Miklas's words, and that the letter on page three was to "cleanup" page two and was written by Miklas.

{¶7} Agent Burke testified that when Miklas wrote that he touched T.N. with his finger in her vagina, he asked Miklas how far he put his finger in her vagina. He explained that State's Exhibit 3 was a tracing he did of Miklas's left hand. Miklas

indicated he used his index finger, so Agent Burke asked him to draw a line showing how far he inserted his finger. Miklas drew the line on Exhibit 3, and then wrote, "This much of my finger went into your vagina."

**{¶8}** Agent Burke testified that he got no indication at any time during the interview that Miklas did not understand what was going on. The interview was not recorded on video, according to the Ohio Bureau of Criminal Investigation's policy. However, Detective Allar viewed the interview via closed circuit television. Agent Burke stated that once they completed all the documents, Exhibits 1-3, he got Detective Allar to come in the room and finish up.

**{¶9}** On cross, Agent Burke testified that it was possible that he put the attachments of the polygraph machine on Miklas before the interview began. He did not remember if Miklas made an exculpatory statement at the beginning of the interview. The agent denied that he indicated to Miklas that he needed to write the letters in order to be reunited with his family. Agent Burke acknowledged that Miklas may have said, "I just want to be with my family," but he could not remember. The agent denied telling Miklas that any statement he made would not be a confession. He confirmed that although the form said "Voluntary letter of apology," it was an attempt to get a confession. He admitted that this could be seen as deceiving.

**{¶10}** Agent Burke said there was no pressure on Miklas to make the changes on page two of Exhibit 2. Regarding Exhibit 3, Agent Burke clarified that Miklas pointed to the finger to indicate depth, and either he drew the line on the hand or Miklas drew it. The agent testified that he asked Miklas what the line represented, and Miklas wrote his own words on the paper.

**{¶11}** On redirect, Agent Burke said he received no indication that Miklas was doing anything related to the documents involuntarily and that Miklas was advised several times that he could leave at any time.

**{¶12}** Next, the State called Detective Ryan Allar, who testified that he first met with Miklas regarding the allegations on April 9, 2008. He identified State's Exhibit 4 as the *Miranda* rights form that he administered to Miklas on that date. The detective

confirmed that during their interview, Miklas denied the allegations and volunteered to take a polygraph test.

{¶13} Detective Allar confirmed that he watched the interview between Agent Burke and Miklas on May 1, 2008. He stated that the only thing he would add to the agent's testimony was that he did not believe the agent had gotten to the point of hooking up the polygraph machine. Detective Allar testified that after Exhibits 1-3 were completed, he entered the room and spoke with Miklas. Miklas told him that initially he was just doing his fatherly duties by putting ice cubes, water, and fingers inside of T.N.'s vagina. Miklas claimed that T.N. had complained that her vagina was red, so he was trying to ease her discomfort. The detective explained that after further questioning, Miklas admitted that he did not know why he was touching her vagina, but it was like he could not control himself. Miklas said he hated himself afterwards, but he did it several times. Miklas also said that he was only able to stop by doing housework or working on an automobile, and then his urges subsided.

{¶14} Detective Allar confirmed that at no point during the interview process was Miklas under arrest. The detective testified that Miklas was free to leave at any time and he did not ask for an attorney.

{¶15} The court then admitted State's Exhibits 1-4.

{¶16} The defense then called Miklas as its only witness. He testified that when he went to the interview on April 9, 2008, he did not know what the allegations were, and the detective accused him of touching T.N. and mentioned a little bit about what she alleged but did not go into detail. The detective asked him about taking a polygraph test, and he explained that he felt he had to take it to prove his innocence and felt like he had no choice in the matter.

{¶17} When Miklas went to take the polygraph test, he first read some books on the test procedure, and then Detective Allar took him to the back room with Agent Burke. The agent read him his rights, and Miklas signed the waiver of rights. Agent Burke asked him to write down questions for a trial test, and then he hooked him up to the polygraph machine. Agent Burke gave him a card to look at, and then asked him some questions

about the card and was able to determine which card Miklas selected.

{¶18} Miklas testified that at that point he found out he was being charged with rape and he panicked and started crying because he was being accused of something he did not do. He remembered that he checked T.N. when she came to him with a problem, and he told Agent Burke that. The agent asked him if he wanted to write a letter of apology and told him it was not a confession.

{¶19} Miklas testified that he wrote the first letter, which was his recollection of what happened. He explained that he and T.N. had been fighting about her boyfriends and that was what he was apologizing for in the letter. Regarding the part of the letter that said "I'm sorry for what I did," he explained that referred to when he checked her because he thought she might have a health problem. He said she had a rash on the side of her legs and was complaining of pain, but he did not put ice in her vagina. He explained that he was not told exactly what T.N. was accusing him of, so in the first letter he was going with what the detective told him at the first meeting regarding putting ice on her. He then stated that he did not know anything about rape until right before he started to write the second letter.

{¶20} Miklas testified that he told Agent Burke, "I just want my family back." The agent told him if he wanted his family back, he had to write down what T.N. said. He responded that he did not know what she said. Miklas explained that when he wrote the second letter, Agent Burke pointed to "I'm sorry about putting ice on you" and "spraying water on you" and then told him to change "you" into "your vagina" at the end of those phrases. The agent also told him that he needed to write that he used his finger in her vagina.

{¶21} Miklas testified that Agent Burke told him at least three or four times that if he wrote the letter, he could get back to his family. Then Agent Burke told him he needed to write the third letter. Miklas said that before he wrote it, he told the agent he still did not know what T.N.'s accusations were. Miklas explained that the first two lines of the third letter were what Agent Burke told him to write, and then the agent said he could add what he wanted on the rest of it.

**{¶22}** Regarding the outline of his hand, Miklas testified that Agent Burke traced his hand and kept asking how far he put his fingers in T.N.'s vagina. Miklas kept shaking his head and said he did not put his finger in her. He stated that Agent Burke drew the line on the paper and told him that he needed to write that he put that much of his finger in her vagina next to the drawing if he wanted his family back. He said that he wrote it down.

**{¶23}** On cross, Miklas stated that he graduated high school and started college but did not finish. He agreed that he can read and write. He confirmed that he drove himself to the polygraph test and that he was not arrested in April. He also agreed that he probably could have called the police on May 1 and told them he did not want to take the test. The State noted that State's Exhibit 1, the *Miranda* rights form, says he was suspected of committing rape, and Miklas responded that he never heard the word "rape" until after the agent hooked him up to the polygraph machine. He did not know if the word was put in after he signed the form.

**{¶24}** On April 20, 2009, Miklas filed a post-hearing memorandum to his motion to suppress and request for additional time to obtain an expert. He alleged that his confession was involuntary because it was unlawfully coerced by the police. He requested that the trial be continued until he could investigate obtaining an expert to testify regarding coercive interrogation techniques. On July 17, 2009, the State responded, opposing Miklas's request for a continuation and appointment of an expert.

**{¶25}** On April 5, 2010, the court issued a judgment entry overruling Miklas's motion to suppress. The court found that "the interrogation did not overwhelm the Defendant's will." Further, the court found Miklas's expert testimony to be admissible for trial purposes.

**{¶26}** After many continuances, the case came before the court for a jury trial on November 4, 2010. The State called Detective Allar, who expounded on his testimony from the suppression hearing. In April 2008, he became involved in the case after Sandra Miklas, Miklas's ex-wife, called his office regarding the allegations. Detective Allar explained that he met with Trina Palmer from Children Services who had interviewed

T.N., and then he contacted Miklas to ask him to come to his office for an interview.

{¶27} During his interview with Miklas on April 9, 2008, Detective Allar informed Miklas that T.N. made allegations that he had "sexually inappropriately touched" her. The detective explained that he tries to avoid terms like "rape." He also discussed the allegation of Miklas putting ice in T.N.'s vagina. Miklas denied putting ice or anything else near her vagina and claimed that he and his children liked to play with ice by throwing it down the back of each other's shirts.

{¶28} Regarding the polygraph test on May 1, 2008, Detective Allar testified that he went into the room after Miklas wrote the first letter, and he spent approximately half an hour with Miklas. Miklas told him that T.N. came to him with a vaginal problem when she was around eight years old, and he was "just checking her" then. Miklas then said that he found himself checking her all the time, but he did not know why. The detective explained that he did not have T.N.'s diary at that point, but her mother dropped it off the next day. The detective identified State's Exhibit 8 as the diary and read an entry on April 1: "He has done so much that scared me so much, he called it checking me."

{¶29} On cross, the detective testified that during the April 9 interview, Miklas became emotional regarding the subject of his family, and he agreed that Miklas made statements that he just wanted his family back together. The detective also confirmed that he was aware that family was a touchy subject for Miklas. Detective Allar discussed this interview with Agent Burke before the May 1 polygraph interview and he gave the agent his report. The detective did not believe that he gave Agent Burke a copy of the whole interview, but he did discuss Miklas's demeanor during the interview with him.

{¶30} The State next called Sandra Keller, who testified that she was married to Miklas from 1997 to 2009. Miklas was the stepfather to T.N. and her younger brother, and Sandra and Miklas also had a son together. Sandra testified that between 1997 and November of 2000, the family seemed happy and T.N. seemed to love Miklas. She described the family relationship from November of 2000 to April 2003, when the first investigation started, as "a little strained." She elaborated that T.N. seemed a little angry, and she had assumed this was because T.N.'s biological father was not there all the time.

{¶31} Regarding the first investigation in April 2003, Sandra explained that she found out that Children Services interviewed T.N. at school regarding "cuddle time" between T.N. and Miklas to determine if anything sexual was occurring. Sandra contacted Children Services and they told her that everything seemed okay and the investigation was closed. She had known that the three kids would cuddle with Miklas, but she did not know before that point that Miklas was cuddling individually with T.N. Sandra explained that these allegations made her angry because she was hurt that somebody would accuse her husband of improper conduct. She told Miklas if he ever touched her children, she would kill him. Miklas told her he did not do anything; all he did was check her. Sandra testified that she believed him.

{¶32} Sandra also recalled an incident where T.N. told her that she itched and was sore, so Sandra took her to the doctor and discovered that T.N. had a slight yeast infection. Sandra confirmed that T.N. did not say that Miklas had checked her.

{¶33} After the Children Services investigation in 2003 through April 2008, Sandra noticed that Miklas did not act as caring towards T.N and he would ground her frequently. T.N. had complained about Miklas grounding her, but she was very angry at that time, so Sandra thought these complaints were just teenage anger.

{¶34} Sandra explained that in the weeks leading up to April 1, 2008, she, Miklas, and T.N. had been fighting a great deal over T.N. wanting to date an African-American boy. On April 1, the three of them had an argument regarding T.N. wanting to date this boy and feeling like she was not allowed to do anything. At one point Sandra told T.N. to go to her room, and then later went to talk to her. She told T.N. she was being unfair and needed to apologize to Miklas. She also told T.N. that she had a good life and she had always made sure that T.N. had never been hurt or sexually abused.

{¶35} The next day, Sandra asked T.N. what was wrong and why was she so mad all the time. T.N. gave her diary to Sandra and directed her to read a part about Miklas sexually abusing her. Sandra did not believe T.N. at first, but T.N. told her it was true. Sandra explained that before they went to the police station, she confronted Miklas and

T.N. She asked Miklas if he did something to T.N. and Miklas said no. T.N. responded, "you are a f [ ]ing liar." Sandra said that she knew T.N. was telling the truth because she would not confront an adult in that manner otherwise.

{¶36} Sandra and T.N. went to the police station, and the police took T.N. into a separate room to talk to her. When T.N. came out, she was in tears and Sandra said that she knew she was not lying. At that point, Sandra did not know specifically what T.N. was alleging, only that Miklas had abused her. She did not become aware of the specific allegations that Miklas used ice, water, and his finger until after T.N. had talked with a Children Services counselor.

{¶37} Sandra identified State's Exhibit 3 as a letter from Miklas that she found on T.N.'s bed the day after she confronted Miklas about the abuse. Sandra testified that she spoke with Miklas after he went to the police station to take the polygraph test, and he told her that he confessed. She asked him why he would confess if he did not do it, and Miklas replied to get his family back. He did not say that the police told him he had to confess to get his family back.

{¶38} On cross, Sandra denied that before the Children Services investigation in 2003, she knew about the incident where T.N. had a rash and Miklas placed ice and water on her to make her feel better. She said that she did not know when T.N. had the yeast infection or if the yeast infection incident was when Miklas may have placed ice on her. She agreed that at the time T.N. made the allegations in her diary, the relationships between T.N. and herself and T.N. and Miklas were not good, and these problems related to the boy T.N. was dating. She and Miklas had a policy that T.N. had to introduce boys to them when she wanted to date them, and T.N. would not let them meet the boy she was dating at the time she made the allegations in her diary.

{¶39} The videos of Miklas's interview with Detective Allar in April 2008 and T.N.'s interview with Detective Allar and Trina Palmer were then played for the jury.

{¶40} The State then called T.N. who testified that all the incidents where Miklas touched her occurred at their house in the bedrooms, laundry room, and on the pool table. The first time he touched her inappropriately occurred when she told him she

itched "down there", meaning her vaginal area. Miklas said he needed to check it to make sure she was okay. She wanted her mother, but he said it was his job to check her because he was the dad. Miklas took her into his bedroom, laid her down, put her knees up, and pulled her pants off. She stated that there was a blanket over her so she could not see anything, but she did not have any doubt that he put his finger inside of her. He did not use ice on her that day. T.N. further testified that when her mother came home, she told her about the irritation and Sandra took her to the doctor. T.N. said she did not tell her mother what Miklas had done earlier that day because she was afraid she would get in trouble.

{¶41} T.N. explained that the next time Miklas touched her inappropriately occurred a day or two after the first incident. Miklas took her back to the bedroom and told her that he had to check to make sure she was okay. She said he again told her to lie down on the bed, and then put a blanket over her legs and put his finger inside her. She confirmed that Miklas knew she had already been to the doctor when he checked her the second time. He did not use ice during this incident. She explained that she was pretty sure Miklas put his finger inside her and penetrated her because she felt it.

{¶42} T.N. testified that the abuse happened many times after these two incidents. She described abuse during this period that happened once or twice on the pool table in their house. Miklas picked her up and laid her on the pool table, took her pants and underwear off, put a blanket over her, and put his finger inside her. She described an incident in the bedroom where Miklas put an ice cube inside of her and left it there until it melted. He did not say why he was putting ice inside her, but she cried because it hurt. T.N. confirmed that Miklas used ice on her more than once. She further testified that Miklas used a squirter on her more than once to squirt water into her. Regarding the abuse in the laundry room, T.N. explained that Miklas would tell her to switch the laundry and he would pick her up and put her on the washer and dryer. He would have her lay back, cover her with a blanket, and use his finger.

{¶43} T.N. explained that "cuddle time" was when Miklas would wake her up in the morning before school when her mother left for work, and he would bring her into his

room and lay with her. She stated that sometimes it just was the two of them and sometimes her little brothers would be there too. T.N. explained that sometimes Miklas would just cuddle with her and when her brothers were in the room, nothing inappropriate occurred. Other times when she was alone with Miklas, he would touch her inappropriately in the vaginal area. If her mother leaving for work woke her up, she would hide from Miklas under her blanket. If he found her hiding, he would get her out of bed or sometimes would carry her into the bedroom if she did not want to go.

{¶44} T.N. testified that she never told anyone what Miklas was doing to her before the investigation in April 2003. Miklas told her not to say anything; he would tell her that he was just checking her and that was what he was supposed to do and it was just between them. She confirmed that State's Exhibit 8 was her diary, but she explained that she had other diaries describing the abuse that she tore up and threw away before the case.

{¶45} T.N. identified State's Exhibit 11 as the statement she made at the police department. The State directed her attention to a portion of the statement that read: "Then he would pull my pants down and put ice in my vagina, also tell me that I stunk and would get a wet washcloth." T.N. explained that Miklas would take a washcloth and wash her vaginal area on his bed, and then use the squirter to squirt water inside of her.

{¶46} T.N. testified that the abuse was "like an everyday thing," and it stopped in April 2003 after the Children Services investigation. She explained that her biological father noticed that she was always really tired, and she told him that Miklas woke her up really early in the mornings to cuddle. Her father asked if anything else was happening and she said no because she thought he would get mad at her. Her biological father reported the cuddling to Children Services. When the Children Services investigator talked to her, she explained the difference between a good touch and a bad touch, which T.N. did not know before. The investigator asked her if anything like a bad touch happened and she did not respond, and when the investigator continued to ask, T.N. said no.

{¶47} T.N. told her mother that Children Services came to talk to her and told her

about the cuddling. She said she realized then that she could have told her mother about the inappropriate touching, but she was scared that she would be mad at her. She could tell her mother did not think anything inappropriate was happening. T.N. explained that before the investigation, Miklas was a little mean to her, but afterwards, he became really mean and would ground her all the time.

{¶48} After the investigation, Miklas did not try to do anything inappropriate for awhile. T.N. explained that he tried one more time when she was approximately 13. She recalled that Miklas told her to take a shower, but she wanted to shower in the morning. When she said no, he started grabbing at her and said that he would undress her himself and put her in the shower. She kicked him and crawled into her closet, and he left when her younger brothers ran into the room.

{¶49} Regarding the fight in April 2008, T.N. explained that when her mother made the comment that she always made sure T.N. was protected and nobody had ever touched her, she was angry because it was not true. She explained that she wrote in her diary that Miklas did touch her. She read the diary entry from State's Exhibit 8:

> * * * When my mom said that she has made sure that he hasn't done anything sexual to me, well she is wrong because Rob has, and I told her but he just lies his way out of it. He has done so much. He has scared me so much. He called it checking and did that to me when I was younger. When I told him to quit for a while, then he started putting ice down my shirt and grabbing my chest, that I have tried so many times to tell my mom but I can't. * * *

{¶50} T.N. explained that her mother later made a comment again that she made sure nobody ever hurt her, so she threw her diary at her mother and showed her the page to read. At first her mother did not believe her, and she made T.N. confront Miklas about it. He denied touching her inappropriately, and she started yelling and calling him a liar. She said that she did not talk about the specifics at that point, only that he touched her inappropriately.

**{¶51}** On cross, T.N. admitted that in March 2008 she was going behind her parents' back to date a boy, and then Miklas made them break up because he would not meet her parents. On March 24, she wrote an entry about her boyfriend telling her he might move to LA when he turned 18 and she might like to go with him if she had the opportunity. She agreed that at that time, she was interested in becoming more independent. On March 28, she wrote an entry about her mother finding out that she was sneaking around to see her boyfriend and her mother and Miklas were angry about it. On March 30, she wrote an entry saying that she asked her boyfriend if he was going to break up with her, and he replied that it depended on whether Miklas "keeps this up." T.N. explained that this referred to Miklas wanting to meet him and grounding her all the time.

**{¶52}** T.N. admitted that her diary entry on April 1 about the allegations did not mention Miklas using his finger, the word "vagina," a washcloth, pool table, or laundry room. She stated that the only time she used detail was when talking to Trina Palmer. T.N. agreed that at the end of this entry, she wrote a PS and said that "he quit once I started dating." She confirmed that she started dating when she was 15 and stated that she was not sure what the PS meant.

**{¶53}** On April 2, she wrote an entry that began, "Well, it's just another day, just got ready for school." This entry talked about her relationship with her boyfriend and moving to LA. She also discussed asking her biological father to move to Martins Ferry so she could live with him. She explained that she wanted to be out of the house, but she wanted her biological father to move there so she could still see her family.

**{¶54}** On April 3, she wrote, "no matter what, it always go back to something with [my boyfriend]" and that she was getting sick of it, so she made up her mind to move in with her biological father. She explained that getting sick of it referred to being grounded all the time. She confirmed that in this entry she also wrote, "Trust me, I will let my mom read this notebook so she knows everything," although on March 23 she had written, "I am just hoping nobody finds this notebook. If someone does, I will be in so much shit I would never see the light of day again."

{¶55} T.N. identified Defendant's Exhibits A and B as photographs taken on September 29, 2007 of her and Miklas before her eighth grade formal. She agreed that the hand gesture she was making in Exhibit A meant "rock on." She confirmed that Exhibit B showed her and Miklas hugging.

{¶56} T.N. admitted that her statement to the police referred to Miklas taking her into the bedroom and putting ice in her vagina, but she did not reference a finger, the laundry room, or the pool table. She explained that she was really shook up that day. T.N. denied telling Miklas's mother in late March or early April 2008 that "I will get even with him." She also explained that she watched scary movies with Miklas because he told her she had to.

{¶57} On redirect, T.N. testified that regarding Defendant's Exhibits A and B, the photographs, Miklas told her she had to take a nice picture with him or she was not allowed to go to the dance.

{¶58} Next, the State called Agent Burke who restated much of his testimony from the suppression hearing. He also testified regarding the baseline in a polygraph test. He explained that during a polygraph test, after explaining the polygraph procedure and putting the attachments on, he would set the baseline. The baseline is a stimulus test consisting of seven cards with odd numbers 3 to 15 on them. The subject picks a card, looks at the number, and then puts the card back. Then he tells the subject that he is going to ask them if they picked each number and to answer no to all numbers, even the one that they picked. He was able to discern which number Miklas picked by using the polygraph charts.

{¶59} Agent Burke testified that after he determined the card Miklas picked, he told Miklas that he would be able to determine whether he told the truth or lied. At that point, Miklas started asking several "what if" questions, such as what if he checked T.N. to see if she was in pain or if he put ice on her because of a rash. Agent Burke explained that Miklas was questioning whether it would look as though he were lying on the test if he said no, he did not touch her. The agent explained that he was hesitant to administer the polygraph test because the "what ifs" can cause problems on the test, so he started a

further interview to confirm what Miklas was saying.

**{¶60}** Agent Burke explained that during this interview, he asked Miklas why he touched his daughter. Miklas responded that she complained that her vagina hurt, so he was just checking her. Agent Burke asked if Miklas ever inserted his finger into her bare vagina, and Miklas indicated that he did. The agent told him that what he did was wrong and asked if he was sorry that he did it. Miklas became emotional and responded that he was sorry and wanted to get his family back. The agent clarified that he never insinuated that if Miklas wanted to get his family back, he had to write the letters of apology.

**{¶61}** Agent Burke testified that based on the times on the forms, he started the waiver of rights at 9:26 a.m. and completed his part of the examination at 11:49 a.m. He confirmed that the *Miranda* rights form stated that Miklas was suspected of committing rape, and that he read that to him. The agent also stated that at the beginning of the interview, he asked Miklas if he knew what he was there for, and according to his notes, Miklas replied that his daughter said he touched her and did something with ice and a dropper.

**{¶62}** On cross, Agent Burke confirmed that Miklas made a completely exculpatory statement at the beginning of the interview, but during the suppression hearing, he had testified that he could not remember whether Miklas made an exculpatory statement.

**{¶63}** The State then rested its case and moved to admit its Exhibits 1 through 11. The defense objected to Exhibit 3, the letter Miklas left on T.N.'s bed, and the court stated it would wait until the case was over to rule on it. The defense moved for a judgment of acquittal, which the court overruled.

**{¶64}** The defense called Dr. Kristen Haskins as its first witness. Dr. Haskins testified that she is a clinical psychologist with a Doctorate of Psychology. She was licensed by the Ohio State Board to practice psychology in 1982 and her specialty is criminal forensic psychology. She had been in private practice of clinical and forensic psychology since 1993, seeing people for issues such as competency to waive *Miranda* to make a statement. After she finished her professional qualifications, the court qualified

her as an expert in the field of psychology.

{¶65} Dr. Haskins testified that the court authorized her to conduct an evaluation of Miklas. She saw him in December 2009 for around 4 hours and 15 minutes. She explained that she reviewed his history with him, and she described him as a "fairly normal fellow." She also administered psychological testing in the form of the Minnesota Multiphasic Personality Inventory. His results showed that he was trying to put his best foot forward on the test and did not admit to small faults that most people would admit. She explained that the results of the test might not identify issues because Miklas was trying to make himself look good. However, she concluded that the overall pattern of his answers revealed a normal adult profile.

{¶66} Dr. Haskins also performed tests to analyze interrogative suggestibility and compliance. Regarding suggestibility, she explained that the test assesses whether the examiner can suggest something to the subject and the person will agree to it. She stated that the results showed that Miklas was not particularly suggestible. Regarding compliance, she explained that some people are very compliant with authority figures, but the test showed that Miklas was not particularly compliant. However, she noted that the tests do not measure suggestibility for specific situations.

{¶67} Dr. Haskins also explained that she performed a mental status examination, and she concluded that Miklas was "pretty healthy" psychologically. She noted that he lost control of his emotions while discussing family. She later described family as a core value for Miklas and also his greatest vulnerability. She believed that Detective Allar identified this vulnerability during his interview with Miklas.

{¶68} Dr. Haskins explained that she was asked to examine the issue of the voluntariness and validity of the two statements Miklas made to the police. She explained that some innocent people confess so the interrogation will end and they get to go home. These people believe that the system will work and prove them innocent. She further explained that in some cases, the person is led to believe that if they confess, then everything will be okay and they will get their family back. Regarding Miklas's willingness to take a polygraph test, Dr. Haskins explained that agreeing to take the test could be a

way to end the interview, could show that the person thinks he or she can beat the test, or could be to prove innocence.

{¶69} On cross, Dr. Haskins confirmed that she was brought into the case at the request of defense counsel and was being paid for her services, although on redirect she clarified that the county was paying her, not the defense. She also confirmed that she did not speak with Detective Allar, Agent Burke, or Trina Palmer and she did not review the transcript of the suppression hearing.

{¶70} Next, the defense called Trina Palmer, who testified that she had worked in the Children Services department at the Belmont County Department of Job and Family Services for 17 years. She interviewed T.N. during the Children Services investigation in 2003 and she was also involved in the case since T.N. made the allegations in April 2008.

{¶71} Regarding the 2003 investigation, Palmer recalled that during the interview, T.N. told her that Miklas never did anything to her that was bad. Palmer noted that T.N. was very worried about getting in trouble for talking to her, and she told T.N. that she did not believe it would be a problem. Palmer testified that the investigation was unsubstantiated, and she wrote in her report that she was comfortable saying nothing inappropriate was occurring between T.N. and Miklas.

{¶72} On cross, Palmer confirmed that her report from the 2003 investigation stated that T.N. shut down during the interview. She explained that by shut down, she meant that T.N. did not want to talk about it. She further testified that she has experienced children shutting down during interviews and then later disclosing things that happened many times. She confirmed that T.N. shutting down during their interview was not unusual at all.

{¶73} Regarding the 2008 investigation, Palmer testified that she was present when Detective Allar interviewed Miklas in April. She confirmed that during that interview, Miklas denied ever touching T.N. inappropriately and denied placing ice on or near her vagina and did not qualify this in any way. Palmer also observed Miklas's interview in May via the closed circuit television. She confirmed that Agent Burke never told Miklas directly or indirectly that if he wanted his family back, he had to sign the letter of apology.

She heard Miklas make the comments that he put his finger in T.N.'s vagina multiple times between the ages of eight and ten, and that he could not stop.

{¶74} On redirect, Palmer confirmed that during their 2003 interview, T.N. told her that if anyone touched her anywhere that made her feel funny, she would yell and tell someone.

{¶75} The defense then called Florence Miklas, Miklas's mother. Florence recalled that in late March or early April 2008, T.N. told her that she was going to get even with Miklas. Florence did not know why T.N. said this, but stated that T.N. and Miklas must have been fighting.

{¶76} The defense next called Fred Deaton, who testified that Miklas is one of his best friends and he has known him for over 30 years. He stated that he met Sandra through Miklas and is also good friends with her. Deaton said that around 2000 to 2002, he was at Dee's Bar with Miklas and Sandra. Miklas told him in front of Sandra that "he had got his ass chewed out the night before." Miklas said that T.N. had approached him and said she had a burning in her private area, and he had placed ice on it.

{¶77} The defense called Miklas as its last witness. He restated much of his testimony from the suppression hearing regarding the polygraph test. He further testified that he had a very close relationship with T.N. and Shaun. He explained that when he would wake them up in the mornings before school, he would get them up early since they were hard to get up. He would have them come into his bedroom and they would all cuddle. He later clarified that generally all three of the children would be in bed with him, and there were always at least two of them there.

{¶78} He recalled that one morning between November 2000 and November 2002 when Sandra was not home, T.N. told him that she "hurt down below." Miklas asked if she would like him to check it, and T.N. said she did not care. Miklas explained that he had T.N. go in the bedroom. When he went in, she was on the bed and already had her underwear off. He looked and saw a rash from the inside of one thigh to the other side. He told her that he could try putting some ice on it for the burning, and T.N. said she did not care. He touched the inside of her thigh with an ice cube. T.N. said it was cold and

he did not want to make her uncomfortable, so he stopped. He told her he could try putting water on the rash, and she said that was fine. He looked for something to spray water with and all he could find was a "nose sucker thing." He put cool water in it and sprayed her with it, and then gave her a towel to dry off.

{¶79} When Sandra came home, she spoke with T.N. before he had a chance to tell her about what happened. Sandra started screaming at him and asked why he was checking T.N. out. Miklas replied that nobody was there and he did what he thought he should do. Sandra told him she would kill him if he ever touched T.N. again, and Miklas said "fine." He stated that was the end of it, and he did not hear anything about it until 2008. Sandra took T.N. to the doctor the next day and found out T.N. had a yeast infection, but he had nothing to do with treating her.

{¶80} Miklas confirmed that he applied the ice and water for medicinal purposes and he stated that he only put the ice on the side of T.N.'s leg and did not touch the inside of her. He said that he never put his finger inside of her. He further stated that after Sandra threatened him, he never touched T.N. after that.

{¶81} Miklas testified that after the Children Services investigation in 2003, he continued to have a very close relationship with T.N. He explained that they would watch scary movies together and he always took an interest in things she did, like taking her to purchase a bowling ball when she joined the bowling league. He also said that she continued to call him "dad." Regarding T.N.'s testimony that he abused her almost daily, he said that was impossible; he would never do that and her brothers were with them at all times.

{¶82} Miklas explained that Exhibit A showed him and T.N. before her formal, and she was making an "I love you" sign with her hand. He explained that Exhibit B was a photograph of them dancing to "Daddy's Little Girl." He agreed that when the photographs were taken, September 2007, he and T.N. were getting along very well.

{¶83} Regarding his initial meeting with Detective Allar, Miklas testified that when the detective was questioning him, he did not know what he was being accused of, but the detective started making suggestions about ice and water. Miklas said he started to

remember little things, but he did not want to say anything because he felt like the detective was leading him. He did not consider his prior action with the ice and water to be sexual and it had happened seven or eight years before and did not cross his mind.

**{¶84}** Regarding the meeting to take the polygraph test, Miklas claimed that when Agent Burke gave him the *Miranda* rights form to initial, the line that was supposed to contain the charge was blank, and the agent said he would explain that to him in a little bit.

**{¶85}** Miklas also claimed that although T.N. alleged that he abused her on the pool table, he did not get the pool table until 2005 or 2006, long after the alleged abuse.

**{¶86}** On cross, Miklas admitted that during the initial meeting with Detective Allar, after the detective mentioned ice and water, he remembered the incident where he put ice and water on T.N.'s rash, but he elected not to tell the detective. Miklas identified State's Exhibit 2 as a statement he wrote during the initial meeting in which he denied that he ever touched T.N. Miklas then stated that Detective Allar mentioned the ice during the interview, but it took him two weeks to remember the whole incident.

**{¶87}** Regarding the third apology letter, Miklas confirmed that he wrote the part of the letter on his own that said, "I need help. And I hope you all will be there for me." When asked why he wrote that he needed help, he said he was distraught and just wrote whatever he felt at the time.

**{¶88}** Regarding Detective Allar's testimony that Miklas told him that he touched T.N.'s vagina several times, that he did not know why he was doing it, but it was like he could not control himself and kept doing it, Miklas explained that the detective said those things and he agreed because he thought he was going to get his family back.

**{¶89}** The court then admitted State's Exhibit 3 and Defendant's Exhibits A and B.

**{¶90}** After deliberations, the jury found Miklas guilty of both counts of rape and found that the victim was less than ten years of age at the time of the offenses.

**{¶91}** Following a sentencing hearing, the court issued a journal entry on December 27, 2010, sentencing Miklas to terms of 15 years to life on each count, those sentences to run concurrently. The court also classified Miklas as a Tier III sex offender.

**Motion to Suppress**

**{¶92}** In his first of two assignments of error, Miklas argues:

**{¶93}** "The trial court erred in failing to suppress the evidence obtained from appellant on May 1, 2008."

**{¶94}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. McNamara*, 124 Ohio App.3d 706, 710, 707 N.E.2d 539 (4th Dist. 1997). When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Accepting these facts as true, the appellate court conducts a de novo review of whether the facts satisfy the applicable legal standards at issue in the appeal. Id.

**{¶95}** Miklas argues that his confession was involuntary because of the coercive police tactics used to induce it. Specifically, he alleges that Agent Burke told him that he needed to write a letter of apology, which was not a confession, and that writing these letters was the only way for Miklas to get his family back.

**{¶96}** "An involuntary statement is one where the defendant's will has been overborne and his capacity for self-determination has been critically impaired due to coercive police conduct." *State v. Lewis*, 7th Dist. No. 03 MA 36, 2005-Ohio-2699, ¶ 14, citing *State v. Nields*, 93 Ohio St.3d 6, 14, 752 N.E.2d 859 (2001). "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, overruled on other grounds.

**{¶97}** Miklas's argument focuses on whether his confession resulted from police

inducement. He claims that Agent Burke insisted that he clarify the statements in his apology letter to make them incriminating. However, Agent Burke denied these allegations during the suppression hearing and instead testified that the three letters of apology were written in Miklas's own words. Agent Burke stated that he did not tell Miklas what to write but asked him if he wished to clarify his ambiguous statements, and Miklas agreed to do so. The agent also denied that he told Miklas the only way to get his family back was to write the letters. Furthermore, Detective Allar viewed the interview via closed circuit television, and he confirmed that Agent Burke's description of the interview was accurate.

{¶98} Because the trial court found that the interrogation did not overwhelm Miklas's will, the court believed the officers' testimony over Miklas's testimony. Although this interview was not electronically recorded, the trial court was able to view the witness' testimony and judge their credibility. See *Mills*, supra, at 366.

{¶99} Miklas also points to Detective Allar's trial testimony that he learned family was a vulnerable topic for Miklas and that he discussed this information with Agent Burke prior to the polygraph examination. Miklas uses this testimony to bolster his argument that Agent Burke knew that family was a sensitive subject for Miklas and utilized this information to coerce his confession. However, Detective Allar's testimony occurred during the trial, not the suppression hearing; thus, we cannot consider the detective's trial testimony in our suppression analysis.

{¶100} Miklas further argues that Agent Burke's request that Miklas write a "letter of apology" was deceitful because the agent planned to use the letter as a confession. While Agent Burke denied that he told Miklas that any statement he made would not be a confession, he admitted that although the form stated "Voluntary Letter of Apology," its purpose was to obtain a confession.

{¶101} Ohio courts have considered an officer's suggestion that a defendant write an apology letter to the victim as suspect or a form of inducement. See *State v. Bohanon*, 8th Dist. No. 89443, 2008-Ohio-1087, ¶ 11; *State v. MacDonald*, 1st Dist. No. C-860833, 1988 WL 3169, *3 (Jan. 13, 1988). However, these courts considered the

suggestion of an apology letter as one factor in the totality of circumstances test. For example, in *Bohanon*, the Eighth District affirmed the trial court's suppression of the evidence, finding "the inducement inherent in the officer's suggestion that appellee write her aunt a letter of apology, combined with appellee's limited intelligence and psychological conditions, rendered her confession in this case involuntary." *Id.* at ¶ 12. Conversely, in *MacDonald*, the First District affirmed the denial of the suppression motion, finding that although the officer's suggestion that the defendant write an apology letter to a very young victim was "suspect," the totality of the circumstances did not show that the confession was involuntary. *Id.* at *3. In that case, there were questions regarding the defendant's literacy but no allegations that his mentality was not normal; additionally, the court found that the length of the exam was not excessive, the questioning was not continuous, there was no physical mistreatment or deprivation, and the defendant signed a waiver of his *Miranda* rights. *Id.* at *2.

{¶102} Based on the totality of the circumstances in this case, Agent Burke's suggestion that Miklas write a letter of apology did not render his confession involuntary. At the time of the interview, Miklas was a 40 year old high school graduate with some college education; although it appears he lacked prior criminal experience. The record does not reveal any allegations of physical deprivation or mistreatment nor is there any evidence that the interview was overly long. Furthermore, despite Miklas's allegations that he felt he had no choice in whether to take the polygraph test, he drove himself to the police station and he admitted that he was not under arrest and probably could have called to cancel the interview. Agent Burke also stated that Miklas was advised that he could leave at any time. The agent also advised Miklas of his *Miranda* rights, and Miklas signed the waiver form before the interview began.

{¶103} Therefore, the trial court did not err in overruling Miklas's motion to suppress the evidence obtained during the May 1, 2008 interview. Accordingly, Miklas's first assignment of error is meritless.

### Manifest Weight of the Evidence

{¶104} Miklas alleges in his second assignment of error:

{¶105}  "The trial court erred in finding Appellant guilty where that finding is not supported by the manifest weight of the evidence."

{¶106}  When reviewing a judgment under a criminal manifest weight standard of review, "[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶107}  This court's discretionary power to reverse on manifest weight grounds and grant a new trial is exercised only in the exceptional case where the evidence weighs heavily against conviction.  *Thompkins* at 387.  This standard is a high one because the trier of fact was in a better position to determine credibility issues, by having personally viewed the demeanor, voice inflections and gestures of the witnesses.  *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, 797 N.E.2d 1019, ¶ 36 (7th Dist.); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).  A reviewing court therefore should not interfere with the witness credibility and factual determinations of the jury, unless the record demonstrates that a reasonable juror simply could not have found the witness to be credible.  *State v. Mock*, 187 Ohio App.3d 599, 2010-Ohio-2747, 933 N.E.2d 270, ¶ 40 (7th Dist.).

{¶108}  The trial court convicted Miklas of two counts of rape under R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."  R.C.  2907.01(A) defines "sexual conduct" as "vaginal intercourse between a male and female * * * and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶109} Miklas focuses his manifest weight argument on T.N.'s credibility, arguing that her conflicting statements, her admissions that she was deceiving her parents, and the unsubstantiated Children Services investigation show that T.N. was not a credible witness.

{¶110} Miklas initially argues that T.N. made conflicting statements about the abuse, which damages her credibility. He notes that her sole diary entry that mentioned the abuse was vague and did not specify the methods of abuse—finger, ice, or water squirter—nor did it mention the different rooms in which the abuse took place. He further notes that her statement to the police, State's Exhibit 11, only mentioned the abuse occurring in the bedroom.

{¶111} While T.N.'s trial testimony was more detailed than her allegation of abuse in her diary or her statement to the police, it appears that she expanded on the details of the abuse, rather than contradicted herself. Furthermore, T.N. testified that when she gave the statement to the police, she was "really shook up" that day. Although T.N. only specifically mentioned the abuse in one entry in her diary, this diary only covered March and April 2008. She also testified that she had written about the abuse in other diaries that she had previously torn up and thrown away. This court should also note that during her videotaped interview with Detective Allar and Trina Palmer, State's Exhibit 10, while T.N. did not mention the laundry room or pool table, she did specify that Miklas used his fingers, ice, and the squirter. It does not appear incredible that T.N. would have been shaken up upon talking to the police about the sexual abuse and would not include all of the details in her statement that she later specified at trial.

{¶112} Miklas also argues that because he testified that his house did not have a pool table until 2005 or 2006, the abuse could not have occurred on the pool table as T.N. alleged. We note that while he claims in his brief that his testimony about the pool table was supported by his family members, apparently he is referencing letters that family members sent to the trial judge that she attached to her pre-sentence investigation. This information was not before the jury and should not be considered in a manifest weight analysis. Thus, Miklas is attempting to rebut T.N.'s testimony with his own self-serving

testimony, and the jury was in the best position to resolve this conflict in the evidence.

{¶113}  Miklas next argues that T.N. was not credible because she testified that she was deceiving her parents and because she wrote the abuse allegations in her diary after getting in a fight with her mother and Miklas.  T.N. did testify that she was lying to her parents and dating a boy without their permission.  Further, T.N. and Sandra both testified regarding the tumultuous relationship T.N. had with her mother and Miklas at the time she wrote the diary entry about the abuse.  While the jury could consider T.N.'s testimony regarding deceiving her parents and fighting with Miklas in judging her credibility, it appears that a reasonable juror could have found that T.N.'s testimony regarding the sexual abuse was still credible.  Moreover, while Miklas alleges that the photographs, Exhibits A and B, demonstrate his loving relationship with T.N., the jury had a better opportunity to view these photographs in conjunction with the witnesses' testimony.

{¶114}  Finally, Miklas challenges T.N.'s credibility based on the Children Services investigation.  He notes that the investigation took place in 2003, after the abuse that formed the basis of this case occurred, but T.N. had denied any abuse at that time and the investigation was unsubstantiated.  However, Palmer explained that she was familiar with many cases where children denied abuse, and then later came forward with abuse allegations.  She concluded that it was not unusual that T.N. denied any abuse during their interview.  Palmer further testified that T.N. was very worried during the interview that she was going to get in trouble.  Moreover, T.N. testified that she did not tell anyone about the abuse because Miklas told her not to tell anyone.  Thus, considering Palmer's testimony that T.N.'s behavior was not unusual and T.N.'s testimony that she was scared to tell anyone and was told not to say anything by an authority figure, the fact that T.N. did not admit to the sexual abuse during the 2003 investigation does not affect her credibility.

{¶115}  Ultimately, T.N.'s version of what happened conflicts with Miklas's testimony.   The jury found T.N.'s testimony to be the more credible version.  "[D]eterminations of witness credibility, conflicting testimony, and evidence weight are

primarily for the trier of fact." *State v. Funkhouser*, 7th Dist. No. 02-BA-4, 2003-Ohio-697, ¶ 8, citing *DeHass*, supra, at paragraph one of the syllabus. Because the jury was in a better position to weigh the testimony, and T.N.'s testimony is not incredible, the jury did not lose its way and create a manifest miscarriage of justice.

{¶116} Thus, Miklas's conviction was not against the manifest weight of the evidence. Accordingly, his second assignment of error is meritless.

{¶117} In sum, both of Miklas's arguments are meritless. Miklas's confession was voluntarily given; thus, the trial court did not err in overruling his suppression motion. Further, his conviction was not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.