[Cite as *Bay v. Brentlinger Ents.*, 2016-Ohio-5115.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Justin R. Bay, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 15AP-1156 |
| v. | : | (C.P.C. No. 14CV-12333) |
| Brentlinger Enterprises, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

---

D E C I S I O N

Rendered on July 26, 2016

---

**On brief:** *Law Offices of Russell A. Kelm, Russell A. Kelm,* and *Colleen M. Koehler*, for appellant. **Argued:** *Russell A. Kelm.*

**On brief:** *Vorys, Sater, Seymour and Pease, LLP, William G. Porter, II, Tyler B. Pensyl*, and *Kara M. Singleton*, for appellee. **Argued:** *William G. Porter, II.*

---

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Justin R. Bay, appeals a final judgment of the Franklin County Court of Common Pleas entered on December 4, 2015 based upon a decision granting summary judgment to defendant-appellee, Brentlinger Enterprises, and a decision denying a motion to reconsider the issue of summary judgment. On de novo review, viewing the evidence most favorably to Bay and drawing all reasonable inferences in his favor, Bay cannot sustain his fraud allegation against Brentlinger Enterprises, and we affirm the judgment of the Franklin County Court of Common Pleas.

## I. FACTS AND PROCEDURAL POSTURE

{¶ 2} Bay was an employee of Brentlinger Enterprises from November 2012 to October 27, 2014. Initially, he was a salesperson with the Audi dealership of Midwestern

No. 15AP-1156

Auto Group ("MAG") which is part of Brentlinger Enterprises.[1]  However, after approximately one month, Bay became "Director of Business Development" for MAG. (Oct. 5, 2015 Bay Dep. at 25-26.)  As director, he earned roughly $6,000 (and later $8,000) per month.  He was an "at will" employee and understood that he could be fired for any reason or no reason, and correspondingly, he could quit at any time.

{¶ 3}  Bay had no formal employment agreement.  However, Bay did sign a number of agreements upon accepting employment with MAG.  One agreement, entitled "Confidentiality Agreement," contained relevant terms as follows:

> The Employee acknowledges that [confidential and proprietary] information obtained in the course of his or her employment with the Company is and will remain the property of the Company.  The Employee further acknowledges that his or her employment is for no fixed or definite period of time, and that the Company may terminate Employee's employment at any time with or without cause and with or without notice, at the option of the Company. Likewise, Employee may resign his or her employment at any time.

(Ex. 1 at 1, Bay Dep.)  The agreement also forbade Bay to "furnish[] or disclos[e]" or "copy[] for use other than for Company purposes, any confidential or proprietary information of the Company or any of its clients, including but not limited to  * * * trade secrets, plans or methods of doing business * * * whether written or not, which Employee receives, acquires, learns, prepares, or helps to prepare in connection with his or her employment."  *Id.* at 1-2.  Another agreement signed by Bay was entitled, "Computer and Communications Systems Policy," and it included a list of prohibited activities such as "[u]sing MAG's Systems for non-MAG-related business or for moonlighting (personal income-generating activities)."  (Ex. 2 at 3, Bay Dep.)

{¶ 4}  The events that ultimately culminated in Bay's employment termination from MAG began with a request from Mark Brentlinger, principal of MAG, in early to mid-2013 to a member of the MAG design team to create a graph or display for use on the company website to show payments and car models available at certain payment levels.

---

[1] To avoid confusion between Brentlinger Enterprises and Mark Brentlinger and because many of the documents in the record do so, we shall hereafter refer to Brentlinger Enterprises as MAG.

No. 15AP-1156

In late 2013 or early 2014, Bay spoke with Brentlinger and explained that he had an idea that would complement Brentlinger's idea, a widget on the website that would quote payments, provide financing options and match customers with cars in MAG's inventory. Brentlinger told him to look into it to see if it was feasible.

{¶ 5} In the spring of 2014, Bay had another conversation with Brentlinger and explained that Market Scan (the vendor that provided MAG with payment calculating or "desking" software) had provided MAG with its software platform that could be used to facilitate the development and operation of a commercially viable tool of the sort Bay had described to Brentlinger. (Bay Dep. at 67-68.) During this conversation, Bay suggested that an interactive web-based payment calculator/car-buying tool might be patentable. Bay relayed similar information in an e-mail on March 19, 2014 to Brentlinger, and in that e-mail, he referred to the "payment matrix" as "your idea" when addressing Brentlinger. (Ex. 3 at 1, Bay Dep.)

{¶ 6} A few weeks later, on May 1, 2014, Bay again wrote to Brentlinger, this time characterizing the widget as being Bay's idea to make Brentlinger's underlying concept a reality. Like the communication before it, this e-mail explained that Market Scan had provided MAG with a digital platform. However, this e-mail also mentioned the need for further work using a programmer and an I.P. attorney. Although the e-mail did not mention it, Bay explained in his deposition that around this time, he reached out to a patent attorney and was thinking that the application would list him as the sole inventor. However, Bay was working (at least some of the time) on the project during work hours at MAG, using his MAG computer, and the evidence shows that he had assumed the patent would eventually belong to MAG, at least in part.

{¶ 7} More than two months later, on July 17, 2014, Bay and Brentlinger engaged in the following e-mail exchange:

> [Brentlinger],
>
> We are past the eleventh hour on our opportunity with Market Scan. Please let me know if this something you would like to pursue...
>
> This is the online desking tool you can have propriety rights, thanks to me. :-) I get a cut! $ :-)

No. 15AP-1156

**Need to know fast!**

**Best regards,**

**[Bay]**

* * *

**I have no memory of what this is or that I was ever in a conversation about market scan. So I need allot more information than this to make a decision.**

**[]Brentlinger**

* * *

**This is the payment matrix for our website. However market scan gave us their platform in hopes of making a commercially viable product.**

**We have all the technology in line we need a programmer to tie some things together and protect the product with a patent.**

**Does this ring a bell?**

**Let me know...**

* * *

**Ughh**

**Brain dead, I am brain dead....**

**Hell yes I want this, how much????**

* * *

**labor for programmer $5,000-$10,000**

**Patent $3,500**

**These are estimates could be less could be more.**

* * *

**OK...**

> Get started, do we get some kind of ownership if I am paying for a patent?
>
> * * *
>
> Great I will get started! You will own rights to the patent with me. :-)

(Ex. 6 at 1-3, Bay Dep.)  Immediately following this e-mail chain, Barry Lester, General Manager of MAG,  wrote to Brentlinger to confirm:

> I talked with [Bay]. He said you gave him the green light on market scan?
>
> He said cost would be $5000.00 to $10,000.00 for a programmer and $3500.00 for the patten
>
> Just confirming its a go.
>
> * * *
>
> Yes as long as it works as promised and we own the system for the expense...

(Ex. 7 at 1-2, Bay Dep.)  Lester forwarded the chain to Bay who responded, "Great!  Very excited!!"  *Id.* at 1.

{¶ 8}   In the time following the e-mail exchanges on July 17, 2014, Bay obtained a rough draft of a provisional patent application, obtained an estimate from a programming firm, Oxiem, to work on the product, and obtained a draft of a developer agreement to memorialize the relationship with the programming firm.  Although Bay shared each of these documents with Sean McCarthy, Chief Financial Officer of MAG,  and Lester, he did not specifically point out to them that Bay, and not MAG, was listed as party to the developer agreement and as inventor of the patent.

{¶ 9}   Subsequently, on the evening of September 15, 2014, Bay wrote an e-mail to Brentlinger enclosing an e-mail chain.  The e-mail chain included an article detailing a similar project undertaken by another company in the business of car sales and also set forth communications involving the programming firm, Oxiem, in which Oxiem apparently insisted that it would own whatever code it created.  In light of these potential roadblocks, Bay wrote to Brentlinger:

> Sorry to disturb at a late hour.
>
> This shit is getting real and I need your help.
>
> I'm going to fire Oxiem if they don't agree to our terms.
>
> We need to start dealing with a big development company!
>
> Can we talk tomorrow?

(Ex. 14 at 1-2, Bay Dep.) Bay also e-mailed another message to Brentlinger the same evening saying, "[o]r let me know if I'm stupid and should be fired for being stupid!!!" *Id.* at 1. In light of Bay's comments and attached e-mail chain, Brentlinger replied:

> What is all of this??
>
> Explain it in a paragraph and not in an email string..

*Id.* To which Bay responded:

> This is in regards to the online desking tool project I've been working on. Oxiem is working on this project but they want to own the code they develop. So we will need a new company to do the program work if they don't agree to our terms. Then I find an older article in July from Automotive news stating that Autonation is investing $100,000,000 in doing exactly what I am working on...giving the client the ability to buy a car online. I became emotional when I saw this and that is what spurred my email. When you are available to talk I have a lot to go over with you.

*Id.*

{¶ 10} The next morning, on September 16, 2014, Lester called Bay into his office and asked him if he was looking for personal monetary gain from the project. Bay indicated that he was expecting some sort of bonus, raise, or profit sharing in the event that the project were to ultimately prove a success. Lester informed Bay, that at MAG, employees do not work on projects for individual gain and told him he was fired. Bay then went to speak to McCarthy to tell him what had happened. McCarthy promised to speak to Lester and calm him down.

{¶ 11} Later that day, Bay was called into a meeting with Lester, McCarthy, and Brentlinger (who participated by telephone). Brentlinger was very angry with Bay, seemed to have forgotten the details of the project, and was very upset that Bay would be

listed as the inventor after MAG had paid for the costs of the project so far. When Brentlinger began to berate Bay using profanity, Bay left the meeting.

{¶ 12} That evening, Bay sent an e-mail to McCarthy which included a forwarded e-mail from the attorney who had been drafting the patent documents:

> I do not wish to cause any issues. I'm trying to make MAG a better dealership by providing our clients with alternative options to buy cars. I feel like [Lester] misconstrued the situation. I am obeying the law and being an ethical person. Please stand up for me.
>
> I will give MAG whatever they want and I wish to be fully employed by MAG.
>
> * * *
>
> [Bay] –
>
> Hope you have worked things out.
>
> Just so you are aware, there can be more than 1 inventor. If [Brentlinger] thought of steps 1-4 (for example) of claim 1 and you thought of the rest, then you are both inventors.
>
> Naming people who are not true (or not naming all) inventors invalidates the patent.
>
> [Patent Attorney]

(Ex. 16 at 1, Bay Dep.)

{¶ 13} The next day, September 17, 2014, Bay met with Lester and McCarthy to attempt to explain the situation. During that meeting, it was agreed that MAG would own the patent, that Bay and Brentlinger would be listed as inventors, that Bay was not fired, and that they would all try to put the unpleasantness from the day before behind them. The day after that, September 18, 2014, Bay and McCarthy shared a telephone call with the patent attorney and explained that MAG should be the owner of the patent and that Brentlinger should also be listed as the inventor. Bay testified that he signed a set of assignment documents on September 18, 2014 pursuant to this conversation. But the record does not contain signed copies of such materials.

{¶ 14} The record shows nothing more discussed on the subject until October 24, 2014, when McCarthy asked Bay to sign an assignment of any financial rights in the

No. 15AP-1156

potential patent to MAG for $1. When Bay asked if he had to sign, McCarthy said, "[y]ou like your job, don't you?" (Bay Dep. at 205.) Bay signed without asking for further clarification. Bay also did not discuss his term of employment with McCarthy and understood that he remained an "at will" employee even after this conversation. Moreover, Bay was under the impression that by signing, he was just doing something that he had already done, that is, make the potential patent the property of MAG.

{¶ 15} October 24, 2014, was a Friday. The following Monday, October 27, 2014, Lester terminated Bay's employment by explaining that Bay's position was being eliminated. Lester did not discuss Bay's performance or mention any reason for the termination beyond the fact that Bay's position was being eliminated and his services would no longer be required. However, there is evidence that Lester had intended to terminate Bay ever since September 2013 and that he reinstated Bay after the September 16, 2013 meeting in order to obtain passwords to various computer programs used at MAG. (Oct. 23, 2015 Bay Aff. at ¶ 5, Memo in Opp. to Summ. Jgmt.)[2] Bay never received the $1 contemplated in the assignment agreement.

{¶ 16} On November 25, 2014, Bay sued Brentlinger Enterprises (and therefore MAG) for fraud and fraud in the inducement. Bay's theory as set forth in the complaint, the affidavit, and explained at Bay's deposition, was that McCarthy's question, "[y]ou like your job, don't you?" fraudulently induced him to sign over his rights to the potential patent in exchange for keeping his job despite the fact that MAG intended to fire him anyway. (Bay Dep. at 205; Bay Aff. at ¶ 6-7.) McCarthy testified in his deposition that he had no knowledge of whether Lester intended to fire Bay and did not even learn of Lester's intention until after Bay had been terminated because McCarthy was dealing with a family health issue.[3]

{¶ 17} After a series of trial court pleadings and motions practice not relevant to this appeal, on October 5, 2015, MAG moved for summary judgment. Bay responded in opposition on October 23, 2015 and MAG replied on October 30, 2015. On November 20,

---

[2] Due to a filing error, this document appears on the electronic docket as though it were filed on September 23, 2015. However, the date stamp confirms that it was filed on October 23, 2015.

[3] Because this appeal is from a grant of summary judgment against Bay, the underlying facts recited above are derived solely from Bay's deposition, Bay's affidavit, and other materials to the extent they are not inconsistent with Bay's view of the facts.

No. 15AP-1156

2015, the trial court granted MAG's motion for summary judgment, reasoning in salient part as follows:

> Throughout the events at issue Mr. Bay unquestionably believed that he was an at-will employee and knew that meant he could be fired for any reason or no reason at all. (See, Bay Depo., p. 208) Mr. McCarthy said nothing to plaintiff promising him continued employment if he signed documents. McCarthy merely asked Mr. Bay if he liked his job. Plaintiff testified in his deposition that this exchange was the extent of their conversation. Nothing said would lead a reasonable employee to think they had to sign the documents in order to retain their employment, or cause them to reasonably rely upon such a cryptic statement as changing at-will status into tenure. In short, plaintiff can prove neither fraud, nor reasonable reliance. No reasonable jury could conclude otherwise.

(Nov. 20, 2015 Journal Entry at 7.) The trial court also criticized Bay's use of an affidavit to "attempt[] to speak for" Lester, Brentlinger, and McCarthy by recounting statements allegedly made in their depositions without filing the depositions themselves. *Id.* at 4.

{¶ 18} On December 1, 2015, Bay filed a motion requesting reconsideration of the decision and attached some excerpts of Lester's deposition. The following day, the trial court denied the request for reconsideration. It reasoned as follows:

> [Bay] claims the court misunderstood his claim and that it was not tied to his continued employment (and change from at-will status). Bay thus says his 'fraud claim require[d] only proof that [he] justifiably relied on McCarthy's knowing omission, to his detriment, by signing the Second [patent] Assignment.' (Pl. Motion filed 12/1/15, p.2). Further, 'McCarthy fraudulently omitted to tell Bay . . . that he would again be terminated once he signed the documents assigning the patent to MAG when he hinted strongly to him that he needed to sign to keep his job.' (*Id.* at p. 3-4)
>
> Mr. Bay unilaterally assumed a set of facts. Mr. Bay assumed that in consideration of transferring his patent application rights he could keep his at-will employment. He drew that conclusion without obtaining any express clarification of what his employer intended, or a promise of job security. Essentially all he had to go on was one cryptic question: "you like your job, don't you?" As explained in the original decision, Mr. Bay jumped to the wrong conclusion. Plaintiff

No. 15AP-1156

> has not demonstrated a genuine question of fraud, or of reasonable reliance, sufficient to send this case forward to trial.

(Dec. 2, 2015 Journal Entry at 1.)

{¶ 19} Following these decisions, on December 2, 2015, MAG voluntarily dismissed its counterclaims. With no more claims remaining before it, the trial court, on December 4, 2015, issued a final judgment entry dismissing the case with prejudice and assessing costs against Bay. Bay now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Bay assigns two errors for our review:

> (1) THE TRIAL COURT ERRED IN CONCLUDING PLAINTIFF COULD NOT PROVE HIS CLAIM OF FRAUDULENT MISREPRESENTATION AND, THEREFORE, GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANT.

> (2) THE TRIAL COURT ERRED IN STATING THAT PLAINTIFF BASED HIS FRAUD CLAIM ON THE EXISTENCE OF AN IMPLIED OR EXPRESS CONTRACT ALTERING THE TERMS OF HIS DISCHARGE.

Because these assignments of error are related, we discuss them together.

## III.  DISCUSSION

### A.  Standard of Review

{¶ 21} Civ.R. 56(C) provides:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Supreme Court of Ohio has explained:

> Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 Ohio

No. 15AP-1156

> Op. 3d 466, 364 N.E.2d 267. The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 1996 Ohio 107, 662 N.E.2d 264.

Byrd v. Smith, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10; see also, e.g., Esber Beverage Co. v. Labatt United States Operating Co., L.L.C., 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

{¶ 22} The Supreme Court has also discussed in detail the relative burdens of a movant and nonmovant for summary judgment:

> [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some *evidence* of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

(Emphasis sic.) *Dresher v. Burt*, 75 Ohio St.3d, 293 (1996). In deciding summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Byrd* at ¶ 25. When reviewing a trial court's decision on summary judgment, our review is de novo, and we, therefore, apply the same standards as the trial court. *Westfield Ins. Co. v. Hunter*, 128 Ohio St.3d 540, 2011-Ohio-1818, ¶ 12; *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.

## B. Evidentiary Issues

{¶ 23} Before we consider whether summary judgment was proper, we note that MAG has raised two preliminary evidentiary issues in its brief. First, MAG argues that

this Court should strike references to evidence Bay filed with the trial court after the trial court made its decision on summary judgment. Second, it argues we should disregard Bay's self-serving affidavit.

{¶ 24} The analysis of evidence is appropriate in summary judgment posture. This Court has stated:

> When ruling upon a motion for summary judgment, a trial court only considers admissible evidence. *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 631, fn. 4, 605 N.E.2d 936 ("Only facts which would be admissible in evidence can be * * * relied upon by the trial court when ruling upon a motion for summary judgment."); *Nationwide Life Ins. Co. v. Kallberg*, Lorain App. No. 06CA008968, 2007 Ohio 2041, at ¶ 20; *Molnar v. Klammer*, Lake App. No. 2004 L 072 CA, 2005 Ohio 6905, at ¶ 65; *Brady-Fray v. Toledo Edison Co.*, Lucas App. No. L-02-1260, 2003 Ohio 3422, at ¶ 30.

*Guernsey Bank v. Milano Sports Ent., LLC*, 177 Ohio App.3d 314, 2008-Ohio-2420, ¶ 59; *see also, e.g.*, *Cunningham v. Children's Hosp.*, 10th Dist. No. 05AP-69, 2005-Ohio-4284, ¶ 18 ("A trial court does not abuse its discretion in disregarding an expert's affidavit that does not set forth the information required to qualify the affiant to give expert testimony.").

{¶ 25} Moreover, MAG is correct that in situations where an item of evidence was not available to the trial court at the time it made the decision being appealed, such evidence cannot be considered on review.

> Appellate review is limited to the record as it existed at the time the trial court rendered its judgment. *Fifth Third Bank v. Financial S. Office Partners, Ltd.*, 2d Dist. No. 23762, 2010 Ohio 5638; *Cunningham v. Cunningham*, 5th Dist. No. 09-CA-25, 2010 Ohio 1397, ¶65; *Paasewe v. Wendy Thomas 5 Ltd.*, 10th Dist. No. 09AP-510, 2009 Ohio 6852, ¶ 15. See also *UAP-Columbus JV326132 v. Young*, 10th Dist. No. 09AP-646, 2010 Ohio 485, ¶ 32 ("Our review of summary judgment is limited solely to the evidence that was before the trial court at the time of its decision."). " 'A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter.' " *Morgan v. Eads*, 104 Ohio St.3d 142, 2004 Ohio 6110, ¶ 13, 818 N.E.2d 1157 (quoting *State v. Ishmail*

> (1978), 54 Ohio St.2d 402, 377 N.E.2d 500, paragraph one of the syllabus). Likewise, "a reviewing court cannot consider evidence that a party added to the trial court record after that court's judgment, and then decide an appeal from the judgment based on the new evidence." *Paasewe* at ¶15. See also *Wallace v. Mantych Metalworking*, 189 Ohio App.3d 25, 2010 Ohio 3765, ¶ 10-11, 937 N.E.2d 177 (refusing to consider a deposition filed with the trial court after the court rendered the judgment being appealed); *Waterford Tower Condominium Assn. v. TransAmerica Real Estate Group*, 10th Dist. No. 05AP-593, 2006 Ohio 508, ¶ 13 (refusing to consider evidence adduced to support a motion for reconsideration when reviewing the underlying judgment).

*Wiltz v. Clark Schaefer Hackett & Co.*, 10th Dist. No. 11AP-64, 2011-Ohio-5616, ¶ 13.

{¶ 26} However, Bay appeals both the trial court's summary judgment as well as the trial court's decision on reconsideration of summary judgment, both of which are encompassed in a December 4, 2015 judgment entry by the trial court. While it is true that the trial court did not have Lester's deposition excerpts at the time it decided MAG's summary judgment motion, it did have them when it addressed Bay's motion to reconsider summary judgment. We hold that reference to the excerpts is appropriate in this appeal on the question of whether the trial should have reconsidered its decision but not on whether summary judgment should have been granted in the first instance.

{¶ 27} MAG also argues that Bay's affidavit is self-serving and should not be considered for that reason. The Supreme Court has characterized an affidavit contradicting former deposition testimony as a "sham affidavit" that cannot, without explanation, create a genuine issue of fact sufficient to defeat a motion for summary judgment. *Pettiford v. Aggarwal*, 126 Ohio St.3d 413, 2010-Ohio-3237, ¶ 1, fn.1, syllabus; *Byrd* at paragraph three of the syllabus; *see also Turner v. Turner*, 67 Ohio St.3d 337 (1993), paragraph one of the syllabus (an affidavit inconsistent with deposition testimony does not support a grant of summary judgment). This Court has also recognized that "unsupported and self-serving assertions" in an affidavit that amount to "nothing more than bare contradictions of the evidence offered by the moving party" can be insufficient in defending against a motion for summary judgment. *White v. Sears*, 10th Dist. No. 10AP-294, 2011-Ohio-204, ¶ 8. However, there is no precedent for extending that holding

to allow evidence or an affidavit to be stricken simply because it may contain self-serving assertions.

{¶ 28} The fact that evidence or testimony is "self-serving" is not a basis under any of the Ohio Rules of Evidence for excluding or ignoring evidence. Evid.R. in passim. In fact, any affidavit by a party that is beneficial to that party is likely to be intrinsically self-serving. Unless we are to revert to the ancient and well-repudiated rule that a witness is incompetent to testify where the witness has an interest in the proceedings, the self-serving nature of evidence, standing alone, is not a basis for exclusion. *Compare Messenger v. Armstrong*, 19 OHIO 41 (1850), syllabus (exemplifying the rule of witness incompetence on the grounds of interest in the outcome), *with* Evid.R. 601 (proclaiming that all persons are competent witnesses except as otherwise provided in the rules, which do not include interest as a grounds for lack of competence). If a trial of this case occurred, Bay could take the witness stand, testify in his own interest, and prevail based on that testimony if a jury believed him. Under these circumstances, it would be inappropriate for the court to strike an affidavit used to defend against summary judgment when it essentially offers a sworn statement that summarizes what would be sworn and testified to at a trial.

{¶ 29} Nor does Bay's affidavit violate Civ.R. 56(E) as MAG alleges. Civ.R. 56(E) provides in relevant part:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit.

While it may be unorthodox for an affiant to relate what other persons said in deposition testimony (especially without attaching a copy of the deposition), this practice does not automatically violate Civ.R. 56(E). Perhaps to save deposition transcript costs, Bay, who had obviously and as a party attended the depositions, offered his own sworn statement to paraphrase the testimony of Lester and Brentlinger as he had witnessed them. In this way, he could meet Civ.R. 56(E)'s requirement of personal knowledge having personally heard Lester and Brentlinger testify during their depositions. Because Bay simply relayed

his memory of Lester's and Brentlinger's deposition testimony, rather than attempting to recite the content of their transcripts, Bay did not "refer[]" to a document which he would have been required to attach according to Civ.R. 56(E). (Bay Aff. at ¶ 4-5, 8.)

{¶ 30} In other circumstances Bay's affidavit might fail Civ.R. 56(E)'s mandate that facts in an affidavit be admissible, because a recitation of the statements of other persons in order to establish the truth of what those persons said would typically amount to hearsay. Evid.R. 801-802. However, Lester and Brentlinger were both executive-level employees (and, in the case of Brentlinger, a principal) of the defendant.[4] Accordingly, their statements were not hearsay because they were statements made by a party opponent as set forth in Evid.R. 801(D)(2). *See, e.g.*, *Pontius v. Riverside Radiology & Interventional Assocs.*, 2016-Ohio-1515, ¶ 14-18 (10th Dist.). Had the case gone to trial, Bay would have been permitted to testify from his personal knowledge about what executives said in order to prove the truth of the matters asserted in their statements. Therefore, the material was permitted to be included in his affidavit on summary judgment, since Bay's affidavit does not appear to have been offered to prove the content of deposition transcriptions if they existed at the time but, rather, to be direct evidence of what he heard.

{¶ 31} As such, the affidavit is also not subject to an analysis for admissibility under Evid.R. 1002 through 1004, the contents of which are sometimes referred to as the "best evidence rule."

> The "best evidence" rule, however, does not apply where an officer testifies as to what he heard first-hand. *Lewis*, 7th Dist. Mahoning No. 03 MA 36, 2005 Ohio 2699, at ¶ 132;[5] *State v. Cechura*, 7th Dist. Columbiana No. 99CO74, 2001 Ohio 3250, ¶ 19. "[W]hen a person testifies from memory about a conversation they had with a defendant that just so happened to be recorded, they are not attempting to prove the contents of a recording." *Cechura; see also State v. Turvey*, 84 Ohio App.3d 724, 735, 618 N.E.2d 214 (4th Dist.1992). This is true

---

[4] Although the trial court critiqued Bay's affidavit as "attempt[ing] to speak for Messrs. Brentlinger, Lester, and McCarthy," our examination of Bay's affidavit reveals that it only paraphrases deposition testimony of Lester and Brentlinger, not McCarthy. (Nov. 20, 2015 Journal Entry at 4; Bay Aff. at ¶ 4-5, 8.) This is significant because McCarthy was no longer an employee of the defendant at the time of his deposition, and thus, his statements would not have been defined as "not hearsay" in Evid.R. 801(D)(2)(d).

[5] The full cite for this case is *State v. Lewis*, 7th Dist. No. 03 MA 36, 2005-Ohio-2699, ¶ 132.

> where an officer testifies about a confession and the state presents the written confession itself, because neither the testimony nor the written confession is dependent upon the existence of the videotaped confession. *Id.* Therefore, the "best evidence" rule would not apply.

*State v. Kimmie*, 8th Dist. No. 99236, 2013-Ohio-4034, ¶ 94. It should also be noted that if MAG wished to demonstrate to the trial court that Bay's paraphrasing of what he heard the three executives say at their depositions was not accurate, MAG could have used their deposition transcripts to show error in Bay's recollection.

## C. Whether Summary Judgment Should have been Rendered on the Fraud Claim

{¶ 32} The Supreme Court has determined the elements of a common law fraud claim to be as follows:

> Fraud consists of "(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm-Cleveland Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709.

*Groob v. Keybank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 47. If MAG satisfies its burden to "affirmatively demonstrate[] that [Bay] has no evidence to support [his] claims," then Bay "has a reciprocal burden * * * to set forth specific facts showing that there is a genuine issue for trial." *Dresher* at 293. In other words, if MAG can show that Bay is unable to present at least a question of fact on any one of the necessary fraud elements which he would be required to prove at trial, then MAG will prevail. Conversely, if Bay can show that for each element of fraud, it is either undisputedly in his favor or there is at least a genuine material factual question, then Bay will have successfully defended MAG's motion. Thus, the question is whether the summary judgment record shows that "there is no genuine issue" of fact as to any element of fraud and "that [MAG] is entitled to judgment as a matter of law." Civ.R. 56(C).

No. 15AP-1156

{¶ 33} Bay's theory of fraud in this case, as set forth in his complaint and affidavit and in his deposition, is that McCarthy's question, "[y]ou like your job, don't you?" fraudulently induced him to sign over his rights to the potential patent in exchange for the false implication that he would keep his job if he signed it over. Bay argues that he was not going to keep his job anyway and that McCarthy's rather rhetorical question was designed or intended to make him think either he would lose his job unless he signed the assignment and that he would keep his job if he signed the assignment. (Bay Dep. at 205; Bay Aff. at ¶ 6-7.) McCarthy testified in his deposition that, at the time he allegedly asked this question, which is central to Bay's single fraud claim, McCarthy had no knowledge that MAG's executives did not intend to retain Bay or that they were planning to terminate him anyway.

{¶ 34} While we could parse and analyze each factor of *Groob*, one-by-one*,* we find it unnecessary to do so, since Bay's burden at trial would be to prove by a preponderance of the evidence *each* of the elements necessary to demonstrate fraud. At the pretrial juncture of summary judgment, the question is whether the record shows a "genuine issue as to any material fact" with regard to any element of fraud, and, if not, whether MAG is entitled to judgment as a matter of law on the undisputed facts. Thus, if we find, that the record shows that Bay undisputedly cannot prevail on any element or that there is not at least one question of fact relating to any one element, Bay's claim may be defeated on summary judgment. For the reasons that follow, we conclude that the record does not present evidence to create a genuine issue of fact on whether McCarthy made a false representation or concealed a fact that he had a duty to disclose.

{¶ 35} Drawing all reasonable inferences in favor of Bay, it could be concluded that the question, "[y]ou like your job, don't you?" when posed by an executive to an employee and accompanied by a request that the employee do something, amounts to the representation, "do this or you are fired," or in the converse "sign this and keep your job." Because Bay asserts that he was going to be fired anyway, McCarthy's alleged representation, construed in Bay's favor, may be more in the nature of concealing a fact for which there was a duty to disclose. Bay has offered no evidence to refute McCarthy's statement in his deposition that he did not know Bay was going to be terminated when he presented the assignment for Bay to sign. McCarthy owed no duty to Bay to disclose to

him that he would be fired under the undisputed facts in the record because he could not conceal what he did not know.

{¶ 36} While we have viewed McCarthy's question, "[y]ou like your job, don't you?" in a light most favorable to Bay, as a representation, we recognize that it was not a statement but, rather, a rhetorical question with perhaps an inference. Characterizing the question as a reckless question that creates an inference of knowledge of falsity (*Groob* at ¶ 47), "[y]ou like your job, don't you?" fails in law and in evidence as one of the necessary elements of fraud.

{¶ 37} Black's Law Dictionary defines inference as, "[a] conclusion reached by considering other facts and deducing a logical consequence from them." *Black's Law Dictionary*, 897 (10th Ed.2014). It also defines "inferential fact" as "[a] fact established by conclusions drawn from other evidence rather than from direct testimony or evidence; a fact derived logically from other facts." *Black's* at 710. These definitions do not include assuming a fact (that McCarthy knew Bay would be terminated the next day). Bay offers no evidence to contradict McCarthy's testimony that he did not know Bay would be terminated the next day. McCarthy's question in the context of the other facts in evidence does not permit an inference that would satisfy a necessary element of fraud, "knowledge of its falsity" or "utter disregard and recklessness as to whether it [wa]s true or false." *Groob* at ¶ 47. McCarthy's uncontradicted deposition testimony was that he had no idea that Lester planned to fire Bay and did not find out about it until after it happened because he was dealing with a family health issue. Bay has offered no other facts with which to draw the requisite competing inference that McCarthy knew or was reckless as to whether Bay would continue to be employed even if he signed the forms requested.[6]

{¶ 38} Nor can we find evidence that Bay justifiably relied on McCarthy's question. We note that Bay used company funds to pay for the patent attorney and for the software

---

[6] We acknowledge that "[i]t is a basic rule of law that knowledge as to an employer's business received by an employee in the ordinary course of business is imputed to the employer." *Am. Fin. Corp. v. Fireman's Fund Ins. Co.*, 15 Ohio St.2d 171, 174 (1968). However, "[t]he underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest." *John Hancock Mut. Life Ins. Co. v. Luzio*, 123 Ohio St. 616, 623 (1931). We are not aware of any principle of law that would invert this principle so as to impute knowledge of Lester's decision to fire Bay to McCarthy in the absence of affirmative evidence of some kind, even though Lester and McCarthy were both executives in the same company.

development and had disclosed to Brentlinger that another company had already spent millions developing the same software solution. It is clear from the evidence that Brentlinger was extremely dissatisfied that Bay had spent the company's money and had run into problems with the widget's development and was now claiming that his use of the company's funds (and time) entitled him to retain something of (questionable) value, regardless of the requirements for inventorship attribution in U.S. patent law.

{¶ 39} We consider it appropriate to address reliance because that issue was central to the trial court's holding and also features in Bay's arguments before this Court. Bay argues that he "justifiably" relied on an inference he had drawn from McCarthy's question, "[y]ou like your job, don't you?" that signing a document assigning the potential patent would save his job when that representation was false. *Id.* Bay had already stated to Brentlinger that it would be he and Brentlinger on the patent application. Yet, Bay was executing the undertaking of the patent effort as if it was his personally, with e-mail correspondence with the patent attorney going to his personal, rather than work, e-mail, all the while using company funds to pay for what he at times considered to be a personal undertaking. Under these circumstances, it is difficult to see how he could justifiably rely on any inference from McCarthy's statement, "[y]ou like your job, don't you?" that if he signed the assignment he would keep his job. Bay had already alluded in e-mail statements to Brentlinger that he may be fired for the direction the patent effort was heading. Viewing this evidence in a light most favorable to Bay, perhaps this was his way of apologizing to Brentlinger for the circumstances, but his mention of firing presents evidence of clear self-recognition that he had made some serious errors.

{¶ 40} Even on Bay's version of the facts, Bay was doing nothing he had not already done or intended to do when he transferred his interest in the widget patent effort to MAG on October 24, 2014. Assuming there was an injury involved in signing over his widget patent idea,[7] it is difficult to see how a reasonable mind could conclude that the injury was "proximately caused by the reliance." *Id.* According to Bay's testimony, he always intended that the patent would belong to MAG and, over a month before the October conversation in which McCarthy allegedly posed the "[y]ou like your job"

---

[7] This is a somewhat dubious assumption since Bay's idea was never reduced to code, logic-ties, or a working prototype and has apparently not been successfully patented by either Bay or MAG.

question, Bay signed documents which he believed assigned his rights of the idea to MAG. Whether those documents were actually signed or effective is not clear from the record. But the fact that Bay apparently thought they were and always intended MAG to own the patent shows clearly that he did not assign the rights to the idea as a result of reliance upon McCarthy's statement. Viewing the facts most favorably to Bay, no reasonable mind could conclude otherwise.

{¶ 41} For the reasons expressed, we find no error in the conclusion that summary judgment against Bay was appropriate, and we overrule both of Bay's assignments of error.

## IV. CONCLUSION

{¶ 42} MAG met its burden to show that, viewing the facts in a light most favorable to Bay and drawing every reasonable inference in his favor, Bay's fraud claim fails as a matter of law. Accordingly, summary judgment was appropriate by the trial court. It is the judgment of this Court that the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

HORTON, J., concurs.
DORRIAN, P.J., concurs in judgment only.

———————————

DORRIAN, P.J., concurring in judgment only.

{¶ 43} I respectfully concur in judgment only.

{¶ 44} Bay's affidavit does not aver that Brentlinger or Lester told McCarthy of Lester's September decision to terminate him. Therefore, the affidavit does not affect the conclusion that Bay did not prove fraudulent misrepresentation because McCarthy was not aware that Bay was going to be terminated when he presented the assignment for Bay to sign and stated, "[y]ou like your job, don't you?" (Bay Dep. at 205.)

{¶ 45} Therefore, I do not believe it is necessary to determine the evidentiary issue raised by MAG regarding whether the court could consider Bay's summary of Lester and Brentlinger's deposition testimony contained in his affidavit.